Kenneth Bernard MOORE,
Petitioner–Appellant,

v.

Richard L. DUGGER, Secretary, Florida Dept. of Corrections, Respondent–Appellee.

No. 87–5346.

United States Court of Appeals, Eleventh Circuit.

Sept. 28, 1988.

Thomas F. Ball, III, Allen J. DeWeese, Asst. Public Defenders, 15th Judicial Circuit of Florida, West Palm Beach, Fla., for petitioner-appellant.

Lee Rosenthal, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellee.

Before TJOFLAT and HILL, Circuit Judges, and WARD *, District Judge.

HILL, Circuit Judge: ·

Kenneth Bernard Moore ("petitioner") was convicted of second degree murder in a non-jury trial in Florida state court, and was sentenced to serve twenty-five years in prison. His conviction and sentence were upheld by the Fourth District Court of Appeals of Florida on direct appeal. Petitioner subsequently filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S. C. section 2254 in the United States District Court for the Southern District of Florida. The district court adopted the Report and Recommendation of the magistrate and dismissed the petition. This appeal ensued.

Petitioner's girlfriend, Veronica Wilcox, was murdered during the night of Saturday, June 5, 1982. Petitioner had been living with the decedent and her mother, and these three persons spent that Saturday evening at a local establishment called "The Shop." The decedent obtained a ride

---

* Honorable Horace T. Ward, U.S. District Judge for the Northern District of Georgia sitting by designation.

home early in the evening. Petitioner and the decedent's mother discovered the body when they returned home early Sunday morning.

Petitioner first spoke with a Detective Rein investigating the murder at about 7:00 a.m. on Sunday morning following the murder. During that conversation, according to Detective Rein, petitioner "said that the person that killed [the decedent] would either kill himself or turn himself in." Trial Transcript Vol. I at 28. This conversation terminated when Petitioner agreed to go to the sheriff's office for further discussions. The first interview at the sheriff's office commenced at approximately 8:00 a.m. that same day. At the beginning of this interview, Detective Rein read petitioner his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Petitioner denied any responsibility for the murder, and again predicted that the culprit would either turn himself in or commit suicide. This interview lasted approximately one hour. After it was over, petitioner went to his mother's house.

At approximately noon that same day, officers went to petitioner's mother's house, where they found petitioner resting on the floor, and asked him to return to the sheriff's office for further questioning. Petitioner spoke with another detective for approximately one or two hours, during which time he continued to deny any responsibility for the murder. Petitioner subsequently confessed after Detective Rein returned; there are disputes as to whether Petitioner asked to talk to Detective Rein, and as to how quickly the confession followed Detective Rein's return. Detective Rein testified that petitioner demonstrated with his hand how he had cut the decedent's throat, and that petitioner said he killed the decedent because she wasn't treating him right, because he was jealous, and because he "got tired of her sticking her booty in [his] face." Trial Transcript Vol. I at 41, 64. When Detective Rein began asking what had happened to the murder weapon, petitioner requested an attorney. Detective Rein ceased questioning, got up, and told petitioner that he would return with an attorney. Petitioner then said he would go ahead and finish his story, and he agreed to give his confession on tape. In his taped confession, petitioner again admitted killing the decedent, acknowledged that the police had treated him properly, and stated that he dumped the knife in the canal as he ran back to join the gathering at The Shop. However, in the taped confession he stated that he killed the decedent in self-defense; this differs from the motive he gave in his prior confession, although the motives given in the two confessions are not irreconcilable. The tape ended at 4:03 p.m. when petitioner began crying. Trial Transcript Vol. I at 44–48. Following the taped statement, petitioner renewed his denials of responsibility for the crime.

Petitioner's confession is the only direct evidence of his guilt. Despite the large quantity of blood at the scene of the crime, no blood was found underneath petitioner's fingernails, and the clothing he was wearing on the night in question showed only two spots, neither of which was large enough for the crime laboratory to analyze. Petitioner presented alibi testimony as to his presence at The Shop; there is no dispute that he left The Shop at one point to run an errand, but there is a dispute as to whether he was gone long enough to have committed the crime.

Petitioner claims that his confession was improperly admitted at trial, because it was involuntary and was obtained in violation of his rights under *Miranda v. Arizona.* However, a habeas corpus petitioner has the burden of proving by a preponderance of the evidence that he is entitled to relief. *Alvord v. Wainwright,* 731 F.2d 1486, 1488 (11th Cir.1984), *cert. denied,* 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984). Having made a detailed review of the briefs and the entire record in this case, we conclude that petitioner has failed to meet his burden of showing any error of constitutional magnitude. We therefore affirm the district court's denial of relief.

## I. VOLUNTARINESS

■ We are mindful that the question whether a confession was voluntary is sub-

ject to independent review by the federal courts, so that the conclusion of the state court on this issue does not receive the presumption of correctness afforded by *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985); *Huckelbury v. Wainwright,* 781 F.2d 1544, 1545 (11th Cir. 1986); *Jurek v. Estelle,* 623 F.2d 929, 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203, 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981). We are also aware that "[w]e must weigh the totality of the circumstances and examine their impact on [petitioner]," in order to evaluate "whether the sum of the circumstances compels a finding of involuntariness." *Jurek v. Estelle,* 623 F.2d at 937. To find the confession to have been "voluntary, we must conclude that [petitioner] made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *Id.* We nevertheless conclude that the confession was voluntary.

Petitioner stresses testimony which showed that he had an IQ of 62, functioned at the intellectual level of an eleven-year old, and was classified as educable mentally handicapped. Petitioner also asserts that at the time he confessed, he had been without food or sleep for twenty-five to thirty hours. However, while we "must take into account [petitioner's] mental limitations, to determine whether through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of his own free will," *id.,* mental deficiencies of a defendant, by themselves, are not sufficient to render a confession involuntary. To establish that his confession was involuntary, petitioner must also establish police coercion. *Colorado v. Connelly,* 479 U.S. 157, 163–66, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986).

■ In an attempt to show police coercion, petitioner asserts that he was led to believe that he could go home if he confessed. As evidence of this alleged promise, he relies heavily on the following colloquy at the beginning of the taped statement: "Mr. Moore: 'When will you all let me go home?' Det. Rein: 'Not right this minute. We need to talk some more.'" Trial Transcript Vol. I at 44. The trial court did not accept petitioner's theory. Transcript of hearing on motion for a new trial at 8. Whether the police made a promise to petitioner, and what petitioner believed the police had promised, are factual findings of the state court, which are entitled to a presumption of correctness, even though this presumption does not extend to the state court's conclusion that the confession was voluntary. *See Miller v. Fenton,* 474 U.S. at 112, 106 S.Ct. at 451; 28 U.S.C. § 2254(d). Even were we to treat the subsidiary factual issue as a matter for independent federal review, petitioner has not met his burden of proving the alleged police promise, whether that promise was express or implied. The theory that petitioner confessed because of a police promise is not the only theory that would explain petitioner's initial comments in the taped statement. The prospect of going home would weigh heavily on the mind of any suspect under interrogation, even if the police said nothing on that subject.

Petitioner presents no other evidence of police coercion. Therefore, his claim that his confession was involuntary must fail.

## II.  MIRANDA

■ At trial, the circumstances leading to petitioner's *Miranda v. Arizona* claim were described by Detective Rein and by petitioner, during their respective direct examinations, as follows:

[Det. Rein]: I said, "What did you do with the weapon"—before even that, before we got to that point, he stopped me right there, after we talked about that little sexual thing, and he said he wanted an attorney.

[Prosecuting Attorney]: All right.

[Det. Rein]: So I says, "Fine." I says, "I'll get up right now and get you one."

As I walked to the door and opened the door, I says, "I'll come back with your

attorney," and he says, "Never mind, I'll finish telling you right now."

[Prosecuting attorney]: He said "Never mind"?

[Det. Rein]: "Never Mind," or "No." I don't remember his exact words.

So, I came back in and he told me that he killed her. He was tired of it. I asked him if he wouldn't mind telling me what he just told me on tape and he said, "Okay." And we went and tape-recorded it.

[Prosecuting attorney]: Did he execute another rights card at this point?

[Det. Rein]: Not at that point.

[Prosecuting attorney]: When was the next rights card he did? Was that a day or two later?

[Det. Rein]: That was the next day. The other detective did the rights card.

Trial Transcript Vol. I at 41–42.

[Defense Attorney]: Did you ever tell [Det. Rein]—did he tell you you could have a lawyer at some place along the line?

[Petitioner]: Yes, they told me.

[Defense attorney]: Did you ever tell them you wanted a lawyer?

[Petitioner]: Yes, I told him I wanted a lawyer and so he got up and, like, in this—like he was mad and so I told him. "That's all right, that's all right."

[Defense attorney]: And then you continued to talk to him?

[Petitioner]: Yes.

[Defense attorney]: Did he tell you that anything would or would not happen if you told him you killed the girl?

[Petitioner]: Yes, he told me, he say if I tell him I did it, he'll help me and he told me if I don't tell him, then I can get life for this. I could get life. I'm going to get locked up for the rest of my life if I don't tell him I did it.

*Id.* at 83. Petitioner claims that Detective Rein violated his *Miranda* rights by failing to cease interrogation when he requested a lawyer. However, we are not persuaded that Detective Rein failed to "scrupulously honor [s]" petitioner's rights under *Miranda*. 384 U.S. at 479, 86 S.Ct. at 1630.

The state argues that petitioner was the one who, subsequent to his request for a lawyer, initiated the additional conversation with the investigating officer. We agree. Petitioner relies upon our opinion in *Christopher v. State*, 824 F.2d 836 (11th Cir. 1987), *petition for cert. filed* Oct. 29, 1987 for the proposition that "[t]he 'initiation' doctrine does not apply unless police questioning has entirely ceased for a 'significant period' *prior* to the suspect's *reopening* the dialogue." Initial Brief for Petitioner–Appellant at 33 (emphasis in original). We find *Christopher* distinguishable from petitioner's case, even assuming that, for this purpose, invocation of the right to counsel is subject to the same analysis as invocation of the right to remain silent. *Christopher* was concerned with an interrogation where the police continued to ask questions of the suspect despite his invocation of his right to remain silent; it was clearly the police who initiated the reopening of the dialogue in *Christopher. See* 824 F.2d at 840–41. In this case, however, petitioner was the one who voluntarily elected to continue the dialogue; there is no dispute that he had previously been given *Miranda* warnings, and he acknowledged that he was aware of his right to counsel, but he clearly chose to withdraw his request for an attorney. If a suspect clearly, of his own volition, changes his mind about wanting counsel, we see nothing in *Christopher* to require that the withdrawn request for counsel continue in force.

■ Petitioner also complains that he was not readvised of his *Miranda* rights before the continuation of questioning. He argues that this is required by *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In that case, the Supreme Court held that a suspect, who had previously invoked his right to counsel, knowingly and intelligently waived his right to counsel when he asked police, "Well, what is going to happen to me now?" and then executed an additional waiver of his *Miranda* rights on the following day before he confessed. 462 U.S. at 1042, 103 S.Ct. at 2833. It is true, as petitioner states, that the defendant in *Bradshaw* was advised of his *Miranda* rights between the time he invoked his right to counsel and the time he confessed.

*Id.* Petitioner argues that the additional *Miranda* warnings were critical to the admissibility of the statement in *Bradshaw.* In support of this theory, petitioner implies that additional *Miranda* warnings were not given in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) between the invocation of the right to counsel and the confession, and that this was the crucial fact which made the confession in *Edwards* inadmissible. Initial Brief for Petitioner–Appellant at 33–34. However, petitioner is simply incorrect on this point; additional *Miranda* warnings *were* given in *Edwards.* 451 U.S. at 479, 101 S.Ct. at 1882. Therefore, the presence or absence of renewed *Miranda* warnings is not the key factor in distinguishing *Bradshaw,* where the confession was admitted, from *Edwards,* where the confession was excluded. Our reading of *Edwards* leads us to conclude that the critical factor there was police misconduct; on the morning following Edwards's invocation of his right to counsel, two detectives went to see him at the jail and interrogated him further without his having been provided counsel. *Id.* In the present case, it might be preferable if *Miranda* warnings had been renewed prior to petitioner's confession, but the warnings had been previously given, and petitioner appears to have clearly understood his rights. Furthermore, petitioner had already confessed once by the time he requested an attorney. We are not persuaded that a repetition of the warnings was required in this case to protect petitioner's rights under the federal Constitution.

■ Counsel for petitioner also seeks to characterize his initial statement on the tape[1] as an attempt to exercise his right under *Miranda* to cut off questioning and remain silent. We do not accept petitioner's interpretation of this statement. As noted previously, the prospect of going home would naturally be of great interest to any suspect undergoing interrogation. We are not persuaded that this statement

evidences a refusal to talk further. This request for information about when, in the future, petitioner would be allowed to leave differs markedly from the statements in *Christopher* which we held were attempts to cut off questioning, but which were not honored by police.[2] We conclude that petitioner's statement was not an invocation of his right to remain silent.

■ Nor are we persuaded that petitioner's waiver of his *Miranda* rights was not "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). We recognize that "a valid waiver of *Miranda* rights must not only be voluntary; it must also be *intelligently* made." *Miller v. Dugger,* 838 F.2d 1530, 1538 (11th Cir.1988) (emphasis in original). Whether the petitioner was competent to make such a waiver is a heavily fact-specific inquiry, and depends on the totality of the circumstances. *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023. The magistrate (and by adoption, the district court) concluded that "[i]t is clear that petitioner was advised of his *Miranda* rights, understood then, and signed a card to verify that he understood." Report and recommendation of magistrate at 7. This conclusion, that petitioner made a knowing and intelligent waiver of his *Miranda* rights, is supported by a number of correct observations made by the magistrate: (1) "The record indicates that the petitioner was generally calm and responsive, did not appear confused, and understood the questions put to him." *Id.* at 5. (2) "Petitioner demonstrated how he killed the victim and explained his motive." *Id.* (3) "[D]espite the fact that petitioner's IQ was low, he was characterized as an educable mentally handicapped student." *Id.* at 5–6. (4) "A former teacher testified that [petitioner] made it all the way to the eleventh grade and that his work was 'very good.'" *Id.* at 6. Furthermore, petitioner acknowledged in his testimony at trial that he had been told

---

**1.** "When will you all let me go home?" Trial Transcript Vol. I at 44.

**2.** "Then I got nothing else to say. If you're accusing me of murder, then take me down

there." "I got nothing else to say." "What's the need of me saying anything then?" *Christopher,* 824 F.2d at 840.

he could have a lawyer. Trial Transcript Vol. I at 83. We conclude that, despite petitioner's mental limitations, there is ample support for the conclusion that his waiver of his *Miranda* rights was intelligent as well as voluntary.

The district court's dismissal of the Petition for Writ of Habeas Corpus is

AFFIRMED.