**UNITED STATES of America, Plaintiff,**

v.

**Leetavious GAINES, and Bogard Liddell, Defendants.**

**No. 96–6159–CR–GOLD.**

United States District Court, S.D. Florida.

Sept. 8, 1997.

Andrea M. Simonton, Miami, FL, for U.S.

Howard Schumacher, Ft. Lauderdale, FL, for Leetavious Gaines.

Gary Robert Fine, Ft. Lauderdale, FL, for Bogard Liddell.

### *ORDER ON DEFENDANT LIDDELL'S MOTION TO SUPPRESS STATEMENTS*

GOLD, District Judge.

**THIS MATTER** comes before the Court on Defendant Liddell's motion to suppress

certain statements made to law enforcement officers subsequent to his arrest on September 20, 1996. Defendant Liddell concedes that he was not subjected to police coercion—either extreme psychological coercion or physical coercion. Rather, he contends that, contrary to the testimony of the Government's witnesses, he was not read his *Miranda* rights before giving his statements.[1] He further contends that, because he can neither read nor write, he was not effectively advised of those rights and, therefore, did not knowingly and intelligently waive them. Instead, he claims he signed what he believed to be a waiver of extradition, rather than a *Miranda* waiver form.

The Court does not find Defendant's Liddell's testimony to be credible. As the facts below demonstrate, Defendant Liddell's statements were voluntarily made after a valid waiver of his rights, as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and, therefore, these statements are admissible into evidence at trial.

## I. FINDINGS OF FACTS.

On September 20, 1996, Deputy Sheriff Thomas Perseo of the Alachua County Sheriff's Office, drove to the residence of Defendant Liddell's girlfriend, Stacey Pierce, in Gainesville, Florida, for the purpose of locating and arresting the defendant. There was no response to the initial knock on the front door, but another officer saw a man stick his head out of a bedroom window. After repeated knocking, Defendant Liddell came outside, at approximately 6:20 p.m. Deputy Sheriff Perseo advised Liddell that he was under arrest for warrants from South Florida, and asked him if he wanted to talk to an investigator. When Liddell responded that he did, Liddell was transported to the Sheriff's Office. At approximately 7:35, Detective Robert Gaff, advised Liddell of his rights from his *Miranda* card, which states:

(1) You have the right to remain silent.

(2) Anything you say can be used against you in court.

(3) You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning if you wish.

(4) if you cannot afford a lawyer one will be appointed for you before any questioning if you wish.

(5) if you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

Detective Gaff asked Liddell if he understood each of the rights as explained to him, and Liddell responded that he did. Detective Gaff asked Liddell if he wanted to talk to them, and Liddell responded that he did. The FBI had been notified of his arrest, and Special Agent Jesse Martinez from the Gainesville FBI office requested that they wait for his arrival before questioning Liddell. Therefore, the interview of Liddell did not begin immediately. Liddell asked if he could call his girlfriend, and he was permitted to do so. She was not there, and Liddell left a message on her answering machine. During the course of the interview, Liddell requested and received permission to call his girlfriend at least two more times. Detective Gaff asked Liddell if he wanted anything to eat or drink. Liddell requested a Coke, which was brought to him. Liddell was asked if he wanted crackers, and he declined.

Special Agent Jesse Martinez arrived at the Alachua County Sheriff's Office at approximately 8:15 p.m. Detective Gaff introduced Agent Martinez to Liddell, and advised Agent Martinez that he had read Liddell's rights to him, that Liddell understood his rights, and had agreed to talk to them. Liddell agreed with this, and agreed to talk to Agent Martinez. Special Agent Martinez then re-advised Liddell of his

---

1. In his written motion, Defendant Liddell insists that his *Miranda* rights were never read to him until **after** he had signed the statement. This is contrary to his testimony at the suppression hearing where he stated that such rights were **never** read to him **at all.**

rights from an FBI form. Agent Martinez also read the *Waiver of Rights* portion of the form, which states:

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Agent Martinez then asked Liddell if he knew how to read. Liddell responded that he did. Agent Martinez gave the form to Liddell to read. Liddell read the form and returned it to Agent Martinez. Agent Martinez asked him if he understood it, and Liddell responded that he did. Agent Martinez asked Liddell if he was willing to talk to Agent Martinez, and Liddell responded that he was. Liddell then signed the *Waiver of Rights* at the bottom of the form. This occurred at approximately 8:20 p.m.

Agent Martinez asked Liddell if he had participated in a Burger King robbery. Liddell denied participating in a Burger King robbery, but stated that he participated in a McDonalds robbery in Pembroke Pines. Later in the interview, Liddell said it was a Burger King robbery, not a McDonalds. He said that the people who participated were himself, Lee Gaines, Terrance Gaines and Gaines' cousins, whose names he did not know. When asked who planned the robbery, he said that everyone had planned it. When asked who was armed, he said that everyone was armed with either a revolver or pistol.

Agent Martinez asked Liddell if he had participated in any other robberies that year, and Liddell said that the Burger King was the only robbery that year. Liddell could not remember how much money was taken from the Burger King. Liddell said that he did not have any information about any other robberies committed by the gang. Liddell said that he had committed other hold-ups, but did not remember who or when.

Deputy Sheriff Perseo and Detective Gaff were present during most of the above interview by Special Agent Martinez. They observed, however, that Martinez did not appear to have the same rapport with Liddell that they had established.

After Martinez completed his interview, Deputy Sheriff Perseo asked Liddell if he was willing to talk to Detective Gaff, Liddell said he would. Detective Gaff then went to the office where Liddell was seated, and apologized for the confrontational way that Martinez had treated Liddell. Liddell accepted the apology. Detective Gaff asked Liddell if he would be willing to talk to Investigator Perseo and himself about the robberies and he replied that he would.

Detective Gaff asked Liddell to tell them about the robberies. Detective Gaff asked if they had occurred basically in the Miami area, and Liddell said they had. Liddell said that they were almost always McDonalds or Burger Kings. He said they were all committed by their group. Detective Gaff asked him to explain how the robberies occurred, and Liddell said that Lee would provide a car, which was usually a Dodge Dynasty in various colors. Lee would also provide the handguns, some of which were chrome and some were black. Detective Gaff asked Liddell if they wore masks, and he said yes, that they wore black and red knit ski masks. He said that they would wear mostly black clothes. They would drive up to the drive-thru window and force their way into the store through the window. Once inside they would get all of the money out of the cash registers and the safe. Detective Gaff asked Liddell how much money they would receive, and Liddell said they would split up the money and each would get about $200.

Detective Gaff asked Liddell why he did the robberies. Liddell said that he had been in prison for 6 years and had an extensive criminal history, and that he was broke and could not get a job with his criminal history. Liddell said he had two kids to support and needed money. Detective Gaff asked Liddell if he had a drug problem, and Liddell said no, that he never did drugs.

Liddell asked Detective Gaff and Deputy Sheriff Perseo if they wanted to hear a funny

story. They replied yes. Liddell said that they were in one of the stores, robbing it. He put his gun in the waistband of his pants so he could hold the bag for the money. The gun slid down inside his pants, hit the floor and went off. Liddell said that one round was discharged, but no one was hurt. He said that he forgot that he had left the gun on the floor after they had exited the store. He then went back to the door, but it was locked, so he knocked on the door and told the manager he had left something inside, to please open the door. The Manager opened the door and Liddell picked up his handgun and they left. Detective Gaff asked Liddell why he went back for the gun. He said that his fingerprints were on the gun and he did not want to leave them at the store.

Detective Gaff asked Liddell if he could tell them the locations of the robberies. Liddell said no, that he could not give them specific information. Liddell was shown a list of robberies, and Liddell was asked about them. Liddell said he was not sure of the addresses, but he thought that was the number of robberies they did, maybe a couple less.

The interview concluded at approximately 9:45 p.m. Liddell was permitted to call his girlfriend again before he was transported to the Alachua County Adult Detention Center.

Defendant Liddell testified at the suppression hearing that he had no recollection of being read his *Miranda* rights when taken into custody. He said that he could not read, but he **could "write just a little."** (emphasis added) He said that no one asked him if he could read. He acknowledged signing the *Miranda* waiver form, but denied knowing what the paper was. He thought it was a waiver of extradition. He said that Detective Gaff told him that. He denied being read his *Miranda* rights when Detective Gaff and Investigator Perseo came to see him again. On cross-examination, he reiterated that he did not understand what was being said to him and told the officers that he did not so understand. The Court finds his testimony not to be credible.

## II. CONCLUSIONS OF LAW.

The Government has the burden to prove by a preponderance of the evidence that the defendant made a knowing, voluntary and intelligent waiver of his *Miranda* rights. *U.S. v. Chirinos,* 112 F.3d 1089 (11th Cir. 1997). In *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court set down guidelines to be used in determining the voluntariness of a confession and waiver of rights in the context of a defendant's claim of mental incapacity. There, the defendant claimed that his confession and waiver of rights were involuntary because the defendant was mentally ill, and was following the command of an internal "voice of God" to confess; and, therefore the confession and waiver were not a product of "a rational intellect and a free will." *Id.* at 162–63, 107 S.Ct. at 519–20. The defendant was a chronic schizophrenic in a psychotic state at the time of the confession. The Supreme Court recognized that the mental condition of a defendant was a relevant factor in the voluntariness equation, but held that mental condition alone would not be sufficient to determine lack of voluntariness. Rather, to establish that a confession is involuntary, the defendant must also establish police coercion. *Id.* at 166–67, 107 S.Ct. at 521–22; *Moore v. Dugger,* 856 F.2d 129, 132 (11th Cir.1988). In addition, the Court in *Connelly* held that the voluntariness of a *Miranda* waiver was measured by the same standard as the voluntariness of a confession:

> The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. See *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.... [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"); *Fare v. Michael C.,* 442 U.S. 707, 726–27, 99 S.Ct. 2560, 2572–

73, 61 L.Ed.2d 197 (1979) (The defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.... The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda* ").

Since the record in *Connelly* was devoid of any police overreaching, the Court held that the waiver was voluntary; the fact that the defendant felt an internal compulsion to speak flowing from the "voice of God" which he believed he heard, was not of Constitutional significance.

In *Moore v. Dugger, supra*, the Eleventh Circuit reached the same result in connection with the defendant's claim that his confession and waiver of *Miranda* rights was involuntary because he had an IQ of 62, functioned at the intellectual level of an 11–year old, and was classified as educable mentally handicapped. The court emphasized that the mental deficiencies of the defendant, by themselves, were not sufficient to establish that the confession was involuntary, in the absence of police coercion. 856 F.2d at 132. In addition, the Eleventh Circuit held that the defendant's waiver of *Miranda* rights had been intelligently made, despite his mental limitations. This determination was supported by the fact that the defendant was generally calm and responsive during the interrogation, that he did not appear confused, that he understood the questions put to him. *Accord United States v. Moya*, 74 F.3d 1117 (11th Cir.1996) (mental deficiencies of the defendant, by themselves, are not sufficient to render confession involuntary, in absence of police coercion); *United States v. Barbour*, 70 F.3d 580, 584–85 (11th Cir.1995) (fact that defendant was suffering from severe depression does not render statement involuntary unless agents took advantage of mental illness, and absent any physical or psychological coercion there was no basis for declaring statements involuntary; and waiver was valid where there was no evidence that mental impairment affected defendant's ability to understand *Miranda* warnings),

*cert. denied,* —— U.S. ——, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996).

Where, however, the police take advantage of a defendant's low intelligence by deceptive means, courts have held that waivers could be rendered involuntary. *See, e.g., United States v. Beale,* 921 F.2d 1412 (11th Cir.1991) (unrebutted testimony of defendant who had limited education and was unable to speak English that he signed waiver of *Miranda* rights only after agent told him that signing form would not hurt him established that waiver was not knowingly and intelligently made since by telling defendant that signing waiver would not hurt him, agents contradicted *Miranda* warning that defendant's statements can be used against defendant in court), *cert. denied,* 502 U.S. 829, 112 S.Ct. 100, 116 L.Ed.2d 71; 502 U.S. 894, 112 S.Ct. 264, 116 L.Ed.2d 217 (1991); *Henry v. Dees,* 658 F.2d 406 (5th Cir. Unit A 1981) (where mentally deficient defendant classified as an educable mental retardate, entered into agreement to waive rights and answer questions in a polygraph examination, police breached terms of waiver by falsely advising defendant that he had failed polygraph and asking him to "tell the truth," and therefore defendant's subsequent statements were not the produce of a knowing and intelligent waiver).

The cases relied upon by the defendant to establish involuntariness, unlike the case at bar, all involved police coercion—either extreme psychological coercion or physical coercion. *See, e.g., Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (illiterate defendant with only a third-grade education with limited mental capacity, who had been in custody for over eight hours without food and had not been given access to family, friends or counsel, and whose testimony that he had been subjected to physical violence prior to his confession was unrebutted by the State); *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (defendant with third or fourth grade education was taken into custody by police and interrogated repeatedly over a period of 16 days, not advised of rights until after confes-

sion on 16th day and not allowed use of telephone or visitors); *Beecher v. Alabama,* 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (both confessions held involuntary where at time of first confession defendant, who was wounded by police at time of arrest, had been ordered at gunpoint to speak his guilt or be killed, and five days later, while in prison hospital and in pain, under the influence of drugs, gave a second confession); *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (defendant not advised of rights and held incommunicado after being told by police that he could not call his wife until after he made a written confession); *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957) (uneducated defendant of low mentality, possibly schizophrenic, held in isolation for a week of questioning, where sessions lasted several hours each and first confession did not occur until fifth day); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (murder confession by 15–year old boy, after five hours of interrogation, starting at midnight by police officers working in relays, without advising defendant of his rights).

The Court concludes that Defendant Liddell's statements were voluntarily made, and that he voluntarily waived his *Miranda* rights. Moreover, the Court further concludes that the waiver was made knowingly and intelligently. The Defendant stated on two occasions that he understood his rights and would talk to the police. He said he could read, and appeared to read the FBI Advice of Rights and Waiver of Rights form after it had been orally read to him. He understood the questions that were asked of him, and responded appropriately. The fact that the Defendant claims to have a low IQ does not automatically mean that he is incapable of understanding his rights, and this claimed lack of capacity to understand is belied by his actions at the time of his confession.

**THEREFORE,** for the reasons stated, **it is ordered** that Defendant Liddell's Motion to Suppress Statements is denied.