

# In the Missouri Court of Appeals

## Eastern District

DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102488 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Hon. Richard C. Bresnahan |
| TYRONE BENEDICT, | ) | |
| | ) | Filed: |
| Appellant. | ) | April 19, 2016 |

Tyrone Benedict ("Defendant") appeals from the judgment entered after a jury trial on his convictions for murder in the first degree and arson in the first degree. We affirm.

The sufficiency of the evidence at trial is not challenged on appeal. Viewed favorably to the verdicts, the evidence established the following. The victim was forty-year old Mark Woods ("Victim"). He was paralyzed when he was twenty years old after a car accident. Victim had limited use of one arm, could not use either of his hands or legs and was confined to a wheelchair, which he operated with a joystick. He was able to sign his name by holding a pen in his mouth, and he could use his cell phone and computer. He worked in information technology both at home and at an office.

Victim employed several caregivers to assist him with various basic functions of daily life. Defendant was one of Victim's caregivers; he usually worked from about 4:30 a.m. until about 11 a.m. or noon. One of Defendant's duties was to review all of the caregivers' timesheets. By most accounts, Victim was very detail-oriented, frugal with his money (though

he made a very good salary) and was sometimes difficult to work for. Victim's mother testified that she observed Defendant and Victim arguing often and once overheard Defendant tell Victim "you'll be sorry."

Victim's neighbor testified that at about 4:00 a.m. on February 23, 2011, he awoke to the sound of a slammed door. He looked out the window and saw a person "with flames" on his body or something he was holding come out of Victim's apartment and run towards the parking lot. The neighbor went back to bed, thinking it was a cooking incident. He heard another door slam about five minutes later, but did not get up.

Defendant's roommate testified that Defendant left his apartment for work at the usual time that day. Phone records showed that Defendant placed a call to Victim from a location near Victim's apartment at 4:14 a.m. and made another call from the same location about a minute later. Defendant was back at home by 4:59 a.m., when he made a call from his home to another one of Victim's caregivers, David Brandenberger. Brandenberger testified that Defendant said he could not make it to work and asked Brandenberger to go in for him. Defendant also placed another call to Victim at 5:01 a.m. from Defendant's home. Defendant's roommate testified that when Defendant arrived home, she heard him throw up. He told her he came home from work because he was sick. Defendant told her not to get near him because he was sick, but after he showered, he got back into bed with her.

Around this same time, 5:00 a.m., Victim's neighbor awoke again and smelled smoke. He went outside, saw smoke coming from Victim's door and went back to his apartment to get a fire extinguisher. While there, he also told his mother to call 911. The neighbor then went back to Victim's apartment and tried to go in to help, but the smoke was too thick.

2

By the time Brandenberger arrived at Victim's apartment shortly before 6:00 a.m., emergency personnel were already there responding to the fire. Brandenberger called Defendant at home at 5:57 and told him about the fire. According to Defendant's roommate, Defendant was "worried excited" when the phone rang and, after talking to Brandenberger, turned on the TV to see if there was a news story about it.

Emergency personnel testified that they found Victim dead in his bedroom with four stab wounds on his face and one on his neck, but his cause of death was determined to be carbon-monoxide toxicity from smoke inhalation. A bloodstained knife and a gas can were found in the living room. Victim's apartment also smelled of gasoline, which was found on numerous items in the apartment, including Victim's bed and bedding. It was determined the fire was intentionally set.

Defendant came to Victim's apartment later that morning, at the request of police. He agreed to go to the police station to talk with the investigating officers further, though the officers testified Defendant was not a suspect at that time. Initially, Defendant claimed he had stopped at a convenience store near his home in Maryland Heights on the way to work, determined he was not feeling well and decided to go back home. He claimed he called the Victim twice from his home to tell him he was sick. The officers examined his phone records, which showed that those two calls to Victim were actually made from a location near Victim's home in South St. Louis County. At that point, the officers determined Defendant was a suspect. They began recording the interrogation, and the resulting video was played at trial. The officers read Defendant his Miranda rights, which he stated he understood. Defendant told the officers he had not been to Victim's apartment that morning. When presented the phone records, Defendant changed his story and said he had actually gotten close to Victim's home before

deciding to turn around and go home. About an hour later, Defendant asked for an attorney, and the officers ceased the interrogation. Defendant was not released, and later indicated he wanted to tell the officers what really happened. He denied killing Victim or starting the fire, but admitted that he had in fact gone to Victim's apartment that morning. He claimed it was already on fire and that he tried to rescue Victim. He claimed he did not call 911 because he was scared and wanted to separate himself from the incident.

During the interrogation, police observed burn marks on Defendant's nose, which he claimed was herpes, and on his hand, which he tried to conceal from the officers and then claimed was from cooking Ramen noodles. Later, he claimed he had been burnt trying to rescue Victim, and the officers observed other burn marks on his back and buttocks. They also found a melted lighter in Defendant's pocket. Gasoline was later detected on clothing at Defendant's home, and Defendant's roommate's nephew testified that the gas can found at Victim's apartment was one that was missing from Defendant's garage.

Defendant also told the officers that he had written himself checks from Victim's checkbook in the week before the fire, two for approximately $960 each and one the day before the fire for $2500. Defendant claimed he had permission to write the checks, but none of them appeared in Victim's check register—which was otherwise up to date—and the checks were taken from the back of Victim's checkbook. Defendant also signed Victim's names to the checks himself, though, as Brandenberger and Victim's mother testified, Victim was capable of signing his name himself. Defendant told his roommate that Victim had given him a large cash advance.

The jury convicted Defendant of murder in the first degree, for which he was sentenced to life imprisonment without probation or parole, and of arson in the first degree, for which he received a life sentence. The sentences were to be served consecutively. This appeal follows.

In his first point, Defendant challenges the exclusion of alternative perpetrator evidence. The State filed a motion in limine before trial to exclude evidence that Defendant's co-worker, Brandenberger, had an opportunity or motive to commit this crime. At the pre-trial hearing on that motion, the State explained that Brandenberger said in a deposition that he was very frustrated by Victim and told his aunt a week before Victim's death: "I'd like to see him on fire in his wheelchair." Defendant argued that this statement was relevant to show that the police did not adequately investigate other suspects in this crime and also that it would show Brandenberger's "bias and interest" as a State witness. The court took the motion under submission. Then, on the first day of trial, the court took up the matter again. In addition to being admissible as alternative perpetrator evidence, Defendant argued, he should be allowed to cross-examine Brandenberger about his interest "in keeping these things from the cops because he doesn't want to be labeled as a suspect." The court concluded that its "preliminary ruling is made permanent" but then clarified that it was "still interlocutory, but I'm finding there is not an act directly connecting [Brandenberger] to this event." The court granted the State's motion in limine and prohibited Defendant from mentioning the statement made by Brandenberger regarding seeing Victim on fire.

When Brandenberger testified, there was no attempt to introduce this statement into evidence either substantively as alternative perpetrator evidence or to impeach. The State contends this issue was, therefore, not preserved and can only be reviewed, if at all, for plain error. Defendant argues that because the court made a definitive ruling that the statement did not

constitute an act directly connecting Brandenberger to this crime, it would have been futile to again attempt to introduce the statement on cross-examination. It is unlikely, he claims—even though the trial court's ruling was interlocutory—that the court would have changed its ruling under these circumstances. We need not decide whether the claim was properly preserved because 1) there was no error, plain or otherwise, in excluding Brandenberger's statement as substantive evidence of an alternative perpetrator and 2) any error in prohibiting Defendant from impeaching Brandenberger with that statement was harmless and does not warrant reversal under either a prejudice or a plain error standard.

Generally, a defendant may introduce evidence tending to show that another person committed the charged offense, unless the probative value of the evidence is substantially outweighed by its costs, such as undue delay, prejudice or confusion. State v. Bowman, 337 S.W.3d 679, 686 (Mo. banc 2011); State v. Barriner, 111 S.W.3d 396, 400 (Mo. banc 2003). "When the evidence is merely that another person had opportunity or motive to commit the offense, or the evidence is otherwise disconnected or remote and there is no evidence that the other person committed *an act* directly connected to the offense, the minimal probative value of the evidence is outweighed by its tendency to confuse or misdirect the jury." Bowman, 337 S.W.3d at 686 (emphasis added). Evidence is not admissible just to cast bare suspicion on another person. State v. Speaks, 298 S.W.3d 70, 86 (Mo. App. E.D. 2009). Rather, evidence of an alternative perpetrator is admissible only if there is also proof that the other person committed *some act* directly connecting him with the crime. Id.; see also State v. Wise, 879 S.W.2d 494, 510 (Mo. banc 1994). The defendant must establish "a clear link" between the alleged alternative perpetrator and a "key piece of evidence" in the crime. State v. McKay, 459 S.W.3d

6

450, 458 (Mo. App. E.D. 2014); State ex rel. Koster v. McElwain, 340 S.W.3d 221, 249-250 (Mo. App. W.D. 2011).

Brandenberger's statement that he wanted to see Victim on fire in his wheelchair was not an *act* directly connecting Brandenberger to the crime. We disagree with Defendant's argument that this statement should be interpreted as the beginning of a plan to murder the victim. Regardless of how precisely the expression of his desires matched the crime as it actually happened, the statement is not an *act* directly connecting Brandenberger to the crime. Without other evidence directly linking him to this crime, Brandenberger's statement at best shows that he may have had a motive for this arson and murder. Motive alone has been repeatedly held not to be admissible. See, e.g., Speaks, 298 S.W.3d at 86 (evidence that someone "had been seen looking for a hitman on the internet" would not alone directly connect that person to charged murder); Bowman, 337 S.W.3d at 688-89 (evidence that one was a suspect in similar murders did not directly connect him to charged murder, where no physical evidence linked him to crime); State v. Rousan, 961 S.W.2d 831, 848 (Mo. banc 1998) (suspicions that victims' son was involved in their disappearance and evidence that he struggled with victim in business did not directly connect him to their murders); State v. Chaney, 967 S.W.2d 47, 55 (Mo. banc 1998) (evidence that pedophile lived near victim and lied to police regarding whereabouts at time of murder did not establish a direct connection between him and child's murder).

Defendant cites to State v. Woodworth in support of his argument that the trial court misapplied the direct connection rule. In Woodworth, the victim testified at trial that he had not seen his assailant. 941 S.W.2d 679, 690 (Mo. App. W.D. 1997). The defense attempted to introduce evidence that the victim had actually told various individuals after the shooting that a certain person—not the defendant—was the assailant. Id. The appellate court found the

7

evidence admissible as a prior inconsistent statement, both to impeach and as substantive evidence, which in turn constituted direct evidence linking that other person to the crime. Id. That case is clearly distinguishable from ours, as Defendant has made no argument that Brandenberger's statement was admissible as a prior inconsistent statement. Moreover, a victim identifying someone other than the defendant is significantly more probative of the existence of an alternative perpetrator than is someone else's mere desire to see the victim harmed.

Defendant also cites to McKay, which is equally distinguishable. The evidence regarding an alternative perpetrator in that case—which the appellate court held should have been admitted—included not only the victim's recognition that someone other than defendant resembled the man who robbed her, but also other evidence directly connecting that alternative perpetrator to the crime. 459 S.W.3d at 458. The alternative perpetrator owned the same type of gun as the one used in the robbery; clothes matching the victim's description of the robber's clothes were found concealed in his sofa; the victim's stolen cell phone was used to call his girlfriend shortly after the robbery; his girlfriend had possession of the stolen phone later and had been told by the alternative perpetrator that he stole it from a white person; and he was identified by eyewitnesses as the person who sold the victim's stolen phone. Id. There was no similar evidence linking Brandenberger to the arson and murder in this case. In McKay, the alternative perpetrator had also stolen a cell phone in the immediate vicinity eight days after the charged robbery, and there is no such evidence in this case. Id. Finally, the fact that the State conceded in McKay that there was enough evidence to establish a direct connection between the alternative perpetrator and the crime also sets that case apart from ours. Id. at 460 n.5.

Defendant also contends that, regardless of its admissibility as evidence of an alternative perpetrator, this statement should have been admitted for the purpose of impeaching

Brandenberger because it showed his interest in the case and bias. In criminal cases, interest is shown by evidence that the witness has a stake in the outcome of the proceeding. State v. Winfrey, 337 S.W.3d 1, 7 (Mo. banc 2011). Bias includes "all varieties of hostility or prejudice against the opponent personally or of favor to the proponent personally" and "circumstances of the witness's situation that make it probable that he or she has partiality of emotion for one party's cause." State v. Clark, 364 S.W.3d 540, 544-45 (Mo. banc 2012) (internal quotation marks and citations omitted). Brandenberger's statement that he wanted to see Victim on fire revealed that he may have had a motive to commit the crime, which may have made him a suspect. As a result, he was biased toward the State's cause and had an interest in testifying for the State to ensure Defendant was convicted so as to divert attention away from any suspicion of Brandenberger's own involvement. "Cross-examination about any issue is permissible if it shows the bias or interest of the witness because a witness's bias or interest could affect the reliability of the witness's testimony on any issue." Winfrey, 337 S.W.3d at 8 (internal quotation marks and citation omitted). Therefore, it was error not to allow Defendant to impeach Brandenberger with this statement.

But the error was harmless beyond a reasonable doubt because there was no prejudice resulting from Defendant's inability to use the statement to show Brandenberger's bias and interest. Unlike cases in which courts have found prejudice resulting from the refusal of impeachment evidence, Brandenberger's testimony was not crucial to this case. In Winfrey, for example, the witness testified about the circumstances in which the defendant acquired the unrecovered murder weapon. Id. That witness had previously told someone that he had actually committed the charged murder. Id. Thus, the Court found that evidence showing this witness had an interest to lie about circumstances surrounding the defendant's involvement in the crime

9

was crucial to the conviction could have affected the jury's verdict. Id. In Clark, the Court found that the defendant was prejudiced by his inability to cross-examine one of the two main State witnesses because, if impeached, the jury may have disregarded all of that witness's testimony and relied only on the other main witness, whose testimony was plagued with credibility problems of its own and standing alone may not have been insufficient to convict the defendant. 364 S.W.3d at 545. Thus, in both of those cases the witness's credibility was critical to the defendant's conviction.

In this case, it was *not* the credibility of Brandenberger that determined whether Defendant would be convicted of murder and arson. The only incriminating portion of Brandenberger's testimony related to Victim's ability to sign his own checks. Brandenberger testified that he would fill out his paychecks, but Victim would sign them, and then he would register the amount in Victim's check register. He testified that Victim was a stickler and was very particular about what he wanted Brandenberger to do. This testimony tends to show Defendant did not have permission to write and sign the checks to himself as he claimed because if he had permission, Victim would have signed them himself and, being a stickler for details, would have ensured that they got recorded properly. The remainder of Brandenberger's testimony has little to do with the other "admittedly strong" evidence supporting the conviction: Defendant's burn marks, the gasoline on his clothing, the lighters found in his pockets and the phone records showing his proximity to the scene at the time the fire was set. Moreover, the fact that Victim was detail-oriented and capable of signing his own name was also in evidence from other testimony. Thus, even if Defendant had been allowed to expose Brandenberger's interest and bias and the jury had discredited the entirety of his testimony, there still would have been

10

sufficient other evidence to support the conviction. Excluding that impeachment evidence was harmless error.

Point I is denied.

In his second point, Defendant challenges the admission of statements he made to the police after he invoked his right to counsel. His motion to suppress these statements was denied before trial, and the video of his interrogation was played for the jury and a transcript thereof admitted into evidence. In our determination of whether the evidence was sufficient to support the trial court's ruling, we consider both the evidence at the suppression hearing and at trial. State v. Norman, 431 S.W.3d 563, 568-69 (Mo. App. E.D. 2014). Here, that evidence was uncontroverted as to the following facts, which are also not disputed on appeal.

After Defendant was read his Miranda rights and waived them, he spoke to the police for several hours. About three and half hours into the interrogation, Defendant stated "it's time—it's time—it's time to get an attorney." The officers stopped questioning him immediately and left Defendant alone in the interview room, after escorting him on a bathroom break. About an hour and forty-five minutes later, two other officers came in and asked Defendant to stand up; they testified they were going to take photographs of Defendant's burns. They also asked if he had anything in his sweater. Defendant said "No. Do you want to know what really happened?" The officer said "If you want to tell us," and Defendant said "Have a seat." The officer then explained that he would have to get the interviewing officers back in the room. Defendant said "I didn't kill him." The interviewing officers then came back in the room, and Defendant began telling how he arrived after the apartment was on fire and went in to try and rescue Victim.

After the suppression hearing, the trial court concluded that Defendant had not actually made an unambiguous, unequivocal and specific request for counsel at any point during the

interrogation and thus all the statements made therein were admissible.  The determination of whether a suspect invoked his Fifth Amendment right to counsel is a question of law, and we need not defer to the trial court's conclusion on such questions.  See State v. Homan, 2016 WL 930940 *1-2 (Mo. App. S.D. March 11, 2016).[1]  Rather, we will review the issue de novo.  Id.  A suspect's statement invoking his right to counsel must be sufficiently clear "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  Norman, 431 S.W.3d at 569.  Here, the uncontroverted testimony of the officer indicated that he understood Defendant was invoking his right to counsel when he said "it's time to get an attorney," which prompted them to cease the interrogation.  We agree that Defendant invoked his right to counsel at that time.

Defendant admits that after he asked for counsel, he voluntarily reinitiated the conversation with police when he said "Do you want to know what really happened?"  But he argues that the police were required to re-Mirandize him after he reinitiated the conversation before talking to him any further.  We disagree.

The Fifth Amendment protection against self-incrimination affords any suspect the right to have an attorney present during police interrogation.  Miranda v. Arizona, 384 U.S. 436 (1966).  Therefore, a suspect who has expressed a desire to deal with the police only through counsel cannot be subject to further interrogation until counsel has been made available, unless the suspect initiates further conversations with the police.  Edwards v. Arizona, 451 U.S. 477,

---

[1] Moreover, the parties proceed with this appeal on the assumption that Defendant *had* invoked his right to counsel and only ask this Court to resolve whether Defendant thereafter knowingly and intelligently waived that right when he reinitiated the conversation with police.  As discussed infra, we find that he waived that right and affirm on this theory rather than on the theory that he never invoked his right to counsel in the first place.  See State v. Jackson, 436 S.W.3d 576, 578 (Mo. App. S.D. 2013) (appellate court can affirm denial of motion to suppress on any plausible theory).

485 (1981). The initiation of further conversation by the suspect does not itself show waiver of the previously-asserted right to counsel. Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983). Rather, when the suspect reinitiates conversation and further interrogation follows, the burden remains upon the State to show that subsequent events indicated a knowing and intelligent waiver of the right that had been previously invoked. Oregon, 462 U.S. at 1044. Thus, whether statements made after a suspect has invoked his right to counsel are admissible is a two-step inquiry: did the suspect initiate further discussion with police and did he waive the previously-invoked right. Id.; see also Smith v. Illinois, 469 U.S. 91, 95 (1984); Edwards, 451 U.S. at 492 n.9.

Defendant's contention that there is, or should be, a rule requiring the police to renew Miranda warnings when a suspect reinitiates his interrogation after invoking his right to counsel has been rejected by federal courts. See United States v. Muhammad, 196 F. App'x 882, 887 (11th Cir. 2006). The failure to re-administer Miranda rights in this situation "is not fatal." Id. Though courts have recognized that it might be preferable to renew the Miranda warnings when a suspect reinitiates after invoking his rights, a repetition of the warnings is not required to protect Fifth Amendment rights in that circumstance. See Moore v. Dugger, 856 F.2d 129, 133-34 (11th Cir. 1988); see also Jacobs v. Singletary, 952 F.2d 1282, 1295 (11th Cir. 1992). Rather, courts look at the totality of the facts and circumstances in a particular case to determine whether a suspect's rights have been knowingly and intelligently waived. See Muhammad, 196 F. App'x at 887; Oregon, 462 U.S. at 1046; Edwards, 451 U.S. at 492 n.9; State v. Pennington, 687 S.W.2d 240, 242-43 (Mo. App. W.D. 1985).

Defendant's reliance on State v. Bannister is misplaced. In Bannister, the suspect invoked his right to counsel, then initiated further interrogation and was re-Mirandized before the

13

police took further statements from the suspect. 680 S.W.2d 141, 147-148 (Mo. banc 1984). While the renewed warnings may have been an important factor in determining that the previously-invoked right to counsel had been knowingly and intelligently waived, it was only one of the totality of circumstances the Court considered: it relied on the suspect's "repeated expressions of willingness to talk in the absence of counsel, his volunteered statements to officers about the shooting, his response that he understood his rights, as well as his action in signing the waiver form, show a valid waiver." Id.

Simply because Bannister and other cases have relied in part on the fact that the police re-advised the suspect of his rights does not mean that re-Mirandizing is required. Rather, it is still possible to find a knowing and intelligent waiver of a previously-asserted right when the police have not re-Mirandized the suspect. We can do so here. After invoking his right to counsel, the police properly ceased all questioning and left the room. The officers that came in later to take photographs said and did nothing improper to prompt Defendant to ask them if they wanted to know what really happened. Once the interviewing officers returned to the room, Defendant immediately started talking. This all occurred less than four hours after he was first given Miranda warnings, which he said he understood and which he had just invoked less than two hours earlier when he asked for an attorney. There is no argument that Defendant forgot those rights in that short time period or did not still understand them when he chose to voluntarily start talking to police again. There is no argument on appeal that Defendant was not capable of understanding those rights or that any physical force, threats, promises or coercive tactics were used to obtain the statements at issue. They were properly admitted at trial.

Point II is denied.

14

In his third point on appeal, Defendant claims the court plainly erred in failing to sua sponte grant a mistrial or issue a curative instruction when the State elicited testimony referring to Defendant's request for an attorney. If a defendant exercises his right to remain silent or requests an attorney after being given Miranda warnings, the State may not use that silence against him. See Doyle v. Ohio, 426 U.S. 610, 618 (1976). The State may not use silence or the request for counsel either as affirmative proof of a defendant's guilt or to impeach his testimony. State v. Steger, 209 S.W.3d 11, 17 (Mo. App. E.D. 2006). Defendant asserts that the State was attempting to use Defendant's request for an attorney as proof of his guilt, but that bare assertion is not supported by the record.

There are three references by the State that Defendant claims are Doyle violations. First, the interviewing officer was asked on direct examination about how Defendant changed his story after being shown a conflict between his claimed whereabouts at the time he made calls on the morning of the fire and his phone records:

> Q: Okay what happened after that? Did you keep talking about it and asking him questions?
> A: Yes.
> Q: And did he appear to not want to talk to you anymore at the point?
> A: Yes.
> Q: Okay. In fact, detective, did he even ask for an attorney at some point?
> A: Yes, he did.
> Q: Okay. When he asked for an attorney, what did you do?
> A: We left—Myself and [the other officer] ended the interview and left the room.
> Q: And that's what you're trained to do, right?
> A: That's right.
> Q: If a suspect asks for an attorney and says, I don't want to talk anymore, basically you have to stop, right?
> A: Yes.

The officer then explained how the interview resumed after Defendant indicated he wanted to tell the officers what really happened.

15

The second reference was made during redirect examination of that same officer. The State asked him about Defendant's suggestion during cross-examination that it was the officers' pushing that led Defendant to change his story:

> Q: And so that wasn't really—you didn't have to push, really, to get him to change his story. He just changed it when he saw the evidence in front of him, right?
> A: That's correct.
> Q: And then eventually at some point we saw on the video, he asked for an attorney, correct?
> A: Yes.
> Q: Which I think within seconds you and [the other officer] stood up and left the room.
> A: Yes.
> Q: Okay. And then isn't it true that eventually when [another officer] came back in the room, the defendant and the defendant alone reinitiated that interview process by saying, do you really want to know what happened.
> A: Yes.
> Q: So that wasn't from pushing. That was him reinitiating, correct?
> A: That's correct.

The State mentioned the request for counsel again in closing. After arguing that the officer "was professional in every way" and recounting the manner in which Defendant's statements changed during the interrogation when confronted with the phone records, the State pointed out that the officers properly responded when Defendant said it was time to talk to an attorney.

There is nothing in the above-referenced testimony of the officer or the State's closing argument that was improper under <u>Doyle</u>. There was no specific question the officer asked Defendant that he declined to answer by invoking his rights, nor did the officer indicate that Defendant was dodging his questions by requesting counsel. Nothing in the officer's testimony or the State's questions or argument can be interpreted as suggesting to the jury that it should find Defendant less credible because he invoked his right to an attorney or that it should draw an

16

inference of his guilt based upon his invocation of that right. See State v. Stites, 266 S.W.3d 261, 267-68 (Mo. App. S.D. 2008) (questions and testimony were without direct or even reasonably inferable suggestion that defendant's silence had anything to do with guilt or innocence). Rather, the references were made in the State's attempt to explain the course of the interview and to rebut suggestions raised by Defendant that his statements were not entirely voluntary. Testimony that the officers properly responded when Defendant asked for counsel and only continued talking to him after he reinitiated the conversation counters Defendant's theory that their interrogation tactics were improper. Moreover, when a defendant makes statements voluntarily after waiving a previously-invoked right to an attorney, the officer is allowed to testify about the fact that an attorney was requested. See State v. Nastasio, 957 S.W.2d 454, 461 (Mo. App. W.D. 1997) (state could ask about request for attorney when statements made voluntarily after request).

Even if these references amounted to Doyle violations, we would not conclude that they had a decisive effect on the jury based on the entire record in this case. State v. Dexter, 954 S.W.2d 332, 340 (Mo. banc 1997). There was overwhelming evidence of Defendant's guilt: phone records placed him near the scene of the crime at the relevant time; his gas can was found at the scene; he had burn marks on his skin, gasoline on his clothing and two lighters in his pocket; he admitted to disposing of his charred shoes; and he stole money from the victim days before the murder.

Point III is denied.

In his final points, Defendant claims the trial court erred by failing to include in the verdict-director for first-degree murder the punishment paragraph required by Missouri Approved Instruction 314.02. That MAI provides that, in certain circumstances, the following

17

paragraph "should be used" in the verdict-director for murder in the first degree: "If you do find the defendant guilty (under Count __) of murder in the first degree, you are to assess and declare the punishment at imprisonment for life without eligibility for probation or parole." The Notes on Use explain that the above paragraph is to be used only when the death penalty has been waived and only if the jury is to assess and declare punishment:

> If the death penalty has been waived, the inclusion of the reference to punishment will depend on whether the jury will assess and declare the punishment. If the jury is to assess and declare punishment, the last paragraph of the instruction will be used. A second stage proceeding is not necessary because there is no range of punishment for murder in the first degree. If the last paragraph is included in the verdict director, special verdict forms must be added.

MAI 314.02, Notes on Use 3. It is then further explained that if the death penalty has been waived, "there will be no second stage proceedings," as is directed by Section 565.030.1, and a special verdict form shall be used on which the jury assesses both guilt and the mandatory life sentence without parole. MAI 314.02, Notes on Use 4.

Here, the State did not seek the death penalty, and the jury was to assess punishment. But this trial did not proceed in a single stage. Rather, it was bifurcated into a guilt phase and a punishment phase, presumably because of the other charges submitted, including the lesser offense of second-degree murder and voluntary manslaughter, as well as first-degree arson. The verdict-director did not include the paragraph regarding punishment when the jury retired to deliberate at the end of the guilt phase. No one objected at that time, and Defendant seeks plain error review regarding the giving of that instruction without the punishment paragraph. After the verdicts were returned, but before the sentencing phase began, Defendant asked the court to vacate the murder verdict because of this omission in the verdict-director. He seeks review of the court's refusal to vacate as a preserved error. Under both reviews, we find that the inadvertent omission of this paragraph from the verdict-director in this case could not have

adversely influenced or misled the jury and is, therefore, not a reversible error. See State v. Drisdel, 417 S.W.3d 773, 782-83 (Mo. App. E.D. 2013).

Defendant contends that had the jury known that life without parole was the only sentence that could be imposed if they found him guilty of first-degree murder, it is likely they would have considered the lesser offenses of second-degree murder and voluntary manslaughter that had also been submitted. We disagree. First, the jury was aware that the mandatory sentence for first-degree murder was life without the possibility of probation or parole because that was discussed during voir dire, just days before they retired to deliberate on guilt. No prospective jurors expressed any concern with that being the mandatory punishment for first-degree murder. Though it is not a court instruction, it is entirely proper for the jury to be informed in voir dire of the proper range of punishment for an offense. Id. at 783. It is mere speculation to assume that including the *same* information in the verdict-director would have resulted in a different verdict.

Realistically, the issues of guilt and punishment are often interrelated in jury compromises, particularly where several grades of offenses are submitted for consideration. But that is not the purpose of the MAI's requirement for including the punishment paragraph in certain situations. In other words, the punishment information is not given to the jury in order to inform its decision on guilt. That would be quite contrary to the notion that the jury is not to consider punishment when assessing guilt. See State v. Ware, 793 S.W.2d 412, 415 (Mo. App. E.D. 1990) (arguments by counsel that jury should determine guilt, or level of guilt, on basis of a desired punishment have been consistently treated as improper and prejudicial). Rather, as the Notes on Use reveal, inclusion of the punishment paragraph is necessary for logistic purposes: when the trial is not bifurcated and the jury is assessing the mandatory punishment at the same

19

time as guilt, the guilt and sentencing information must be included in the same verdict-director and verdict form. But the jury is still to determine guilt first. See State v. Hunter, 586 S.W.2d 345, 348 (Mo. banc 1979). "While it may be within reason that a jury might consider the punishment concurrently with guilt, such reasoning does not compel the conclusion that a jury would decide to convict on a felony submission, not on the basis of guilt, but on the basis that it could control the assessment of punishment." Id. at 348. Thus, even if the jury did not recall from voir dire that first-degree murder carried a mandatory life sentence without parole, it is mere speculation that such information on the verdict-director would have caused them to convict, not on the basis of guilt, but in order to control and impose a lesser sentence.

Points IV and V are denied.

The judgment is affirmed.

ROBERT G. DOWD, JR., Judge

Lisa Van Amburg, C. J. and
Lawrence E. Mooney, J., concur.