

# In the Missouri Court of Appeals
## Eastern District
### DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101298 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | 1122-CR04627-01 |
| | ) | |
| CORNELL MCKAY, | ) | Honorable Robin R. Vannoy |
| | ) | |
| Defendant/Appellant. | ) | FILED: December 23, 2014 |

### OPINION

Cornell McKay (Defendant) appeals from the judgment upon his conviction by a jury for one count of first-degree robbery, in violation of Section 569.020, RSMo 2000,[1] and one count of armed criminal action, in violation of Section 571.015. The trial court sentenced Defendant to a term of twelve-years' imprisonment on each count, with the sentences to run concurrently. We reverse and remand for a new trial.

### Factual and Procedural Background

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial: On August 10, 2012, Leigh Deusinger (Victim) left work around 5:00 or 5:30 p.m. and drove to Tower Grove Park, where she met some friends for a "Food Truck Friday" event. At about 8:25 p.m., while on her way home, Victim called her husband but was unable to reach

---

[1] Unless otherwise indicated, all statutory references are to RSMo 2000 as amended.

him.

When she arrived home, she parked on the street in front of her condo. She exited her car and went to the trunk to retrieve a larger purse she had put in it. At this moment, she noticed a young man walk past her. As she opened the trunk and leaned in to retrieve her purse, she saw the same young man walking back towards her. She closed the trunk, and the young man circled around the driver's side of her car and made eye contact with her. He said, "Give me your money," and pointed a gun at Victim's stomach. Victim put up her hands and said, "I don't have anything." The man repeated his demand and then asked if she had a cell phone. Victim told him it was in the front seat, and the man said, "Well, give it to me. Give it to me."

Victim walked back to the driver's door and sat down inside the car and the man put his arm on the door and leaned in. Victim told the man that her phone was in her purse, and she gestured toward it. She then put the purse on her lap, unzipped it, and handed her phone to the man. The phone was an "Evo 3." There was also some cash in the purse that Victim gave to the man. The man asked what else she had, and he "rifled" through the contents of Victim's purse. Victim told him that she did not have anything else and the man turned and ran away toward West Pine.

Immediately following the robbery, Victim retrieved her larger purse from the trunk, and went inside her condo. She was unable to call the police because she did not have a land line. Her husband was not at home. Victim then became "really scared" and turned off the lights, thinking that the man who had robbed her might be able to identify the condo where she lived.

When the robbery occurred, Victim's husband had been out walking their dog. Victim's husband testified that during his walk, he encountered a young man on the street. They nodded

2

to each other but passed without speaking. As Victim's husband was returning to their condo, he saw the same young man on the corner of Boyle and West Pine, about a block from their condo. The man looked at Victim's husband and then ran across Boyle Street. Victim's husband "checked to make sure everything was squared away with the cars," and then he went inside.

When he entered the condo, he found Victim standing in the dark. He asked Victim what was wrong, and she told him she had been robbed at gunpoint. She started shaking and crying, and they called 911 on her husband's cell phone. The 911 call was made at about 8:40 p.m.

When the police arrived, Victim described the robbery and provided a physical description of the suspect. Victim described the suspect as a young African-American male, tall, thin, and very clean cut. She testified that his skin was more light colored, that he was wearing a light-colored, white or powder blue t-shirt, light-colored khaki shorts, and tennis shoes.

After talking to police, Victim decided to leave her phone service on, in an attempt to track the stolen phone. Thereafter, on two occasions, Victim accessed her cell phone account on-line and obtained a list of telephone numbers and calls. She testified that she prepared these lists by "copy[ing] and past[ing] them from the website into an Excel spreadsheet." She then copied the list and e-mailed the information to police. The first list included calls from August 10 to August 13, 2012; the second included calls from August 10 to August 18, 2012.

About eight days after the robbery, Victim canceled her phone service when a friend informed her that she had received a "pocket" call and a strange message from Victim's stolen phone. Aside from a call Victim had made to her husband shortly before the phone was stolen

3

and from the strange "pocket" call to her friend, Victim did not recognize any of the telephone numbers that appeared on the lists she provided to the police.

On August 20, 2012, using telephone numbers provided by Victim, Detective Anthony Boettigheimer (Detective Boettigheimer) obtained the name of Lamont Carter (Carter) from the CrimeMatrix database and in turn obtained the names of several people connected with Carter. Detective Boettigheimer then compared those people to the description of the robber and only Defendant matched the description provided by Victim.

That same day, police compiled a photo line-up that included Defendant and showed Victim the photographs. Victim recognized the man who had robbed her and identified Defendant. Victim's husband did not identify anyone from the photo line-up.

On August 21, 2012, after Detective Boettigheimer put out a "wanted" for Defendant and talked to the associate pastor at Defendant's church, Defendant turned himself in. Victim and her husband went to the Justice Center and viewed a live line-up. They entered the viewing room separately. When Victim entered the room, she immediately saw the man who had robbed her. Victim testified that she took the time to look at each person, but she was sure she recognized the man who had robbed her. Victim's husband identified Defendant as the man he had seen on the street that evening. He was certain that Defendant was the man he had seen. Victim also identified Defendant at trial as the man who had robbed her.

In investigating the case, Detective Boettigheimer interviewed Kaylin Perry (Perry), who indicated that she had received Victim's phone from her boyfriend, Keith Esters (Esters). Detective Boettigheimer then tracked down Victim's phone at a gas station in Wellston. The police had been told that the phone had been sold to someone there. Detective Boettigheimer went to the gas station and retrieved the phone. The gas station employees identified Esters as

4

an individual who sold the phone and was accompanied by Perry. Later, the State charged Defendant with robbery in the first degree and armed criminal action.

Prior to trial, Defendant filed a pretrial notification of his intent to rely on an alternative perpetrator defense and a motion to admit evidence in support of that defense. In response, the State filed a motion in limine to prevent the defense from presenting this alternative perpetrator evidence as well as from mentioning "Megan Boken" (Boken) or "Keith Esters" by name.[2] At the conclusion of the pre-trial hearing, the trial court sustained nearly all of the State's motions in limine, and specifically ruled that Defendant could not present the following evidence in support of his alternative perpetrator defense: Esters's incriminating admissions to Perry and Detective Jackson regarding the robbery; any references to the Boken case or Esters's involvement in that crime; "Keith's" surname; matching clothing found hidden at Esters's residence; and a photograph of Esters shown to BP station employees.

After the State rested its case, there was a lengthy discussion and further offer of proof. The trial judge then partially revised her previous orders noting she had misread Victim's deposition. The court ruled that the defense would be permitted to elicit testimony from Perry that a person named "Keith" had "robbed somebody" for Victim's phone.

Defense counsel made an offer of proof regarding Perry's testimony that Esters

---

[2] Eight days after Victim was robbed and three blocks away, a young woman named Megan Boken was confronted by an armed man who intended to rob her. When Boken resisted, she was fatally shot. Before the trial in the instant case, Esters pleaded guilty to murdering Boken. Detective Jerone Jackson (Detective Jackson) in the Homicide Division handled the investigation of the Boken case. When Detective Jackson learned of Victim's robbery, he obtained the call logs that Victim had provided to police. Detective Jackson in concert with homicide detectives called the numbers on the calls logs and made contact with Esters's girlfriend, Perry, who implicated Esters in the Boken murder and the robbery in the instant case. Sustaining the State's motion in limine and ruling that the evidence was unduly prejudicial to the prosecution, the trial court excluded all evidence related to the Boken homicide.

5

possessed a handgun fitting the description of the weapon used in the robbery. Defense counsel maintained that Esters's possession of a small silver handgun was relevant because it corroborated his statement implicating himself in the robbery. Defense counsel further offered to prove that Carter, who police located from the CrimeMatrix database, sold the small silver handgun to Esters before the robbery and that Carter resided with Perry and Esters at times. The State argued in response that Esters's possession of "a small silver gun" was irrelevant because "half the criminals in the City of St. Louis have a small silver gun." The trial court rejected Defendant's offer of proof regarding Esters's possession of the gun finding that the defense had not established a substantial link between Esters and the gun used in the robbery.

The defense called two witnesses, Perry and Detective Jackson. Before they testified, the trial court told both witnesses that they were not permitted to mention the Boken case or to identify "Keith" by his last name.

At trial, Perry testified that her boyfriend, "Keith," was about 6'0" or 6'2" and nineteen years old. She testified that in August 2012, she had a cell phone with the telephone number 373-0135. She testified that her phone stopped working, and that she started using an Evo cell phone that her boyfriend gave to her. She testified that "Keith" had told her that he "robbed someone for it." On cross-examination, Perry said that "Keith" had told her he had robbed "a white person." Perry testified that she knew Carter. She said that her boyfriend and Carter were friends. She testified that she and her boyfriend sold the stolen phone at a BP gas station. She said that she was with "Keith" when he sold the phone. Perry testified that she did not know Defendant, and that she had no knowledge of Defendant ever associating with her boyfriend.

6

At trial, Detective Jackson testified that he received telephone records from Detective Boettigheimer and that two other detectives called the telephone numbers that appeared on the records. Detective Jackson testified that their investigation led him to Perry and that he talked to Perry about Victim's stolen telephone.

In her direct examination, Victim testified that the self-prepared phone lists included every call. She denied that any calls were omitted from the lists. Victim's call logs indicated that the first outgoing call after the robbery was not made until 9:49 p.m. the next day, more than a day after the robbery.

At the conclusion of the defense's case-in-chief, defense counsel sought to introduce certified call records for Victim's cell phone account it had subpoenaed from Sprint to establish the cell phone's activity after the robbery. The records provided by Sprint included several calls made after the robbery that were not shown on Victim's call logs, including a call made to Perry, "Keith's" girlfriend, approximately 30 minutes after the robbery.[3] The Sprint records also show that on August 11, 2012, a call was placed at 10:31 a.m. to Perry and a call was made at 9:26 p.m. to Carter, who lived with Keith and Perry at times. Neither of these calls was listed on Victim's call logs.[4]

While it did not dispute the authenticity of the proffered Sprint records, the State objected on the basis that the records were confusing and that Defendant needed to present expert testimony to explain the call information to the jury. The trial court sustained the objection and excluded the Sprint records.

At the conclusion of all evidence and argument by counsel on both sides, the jury found Defendant guilty of robbery in the first degree and armed criminal action. Thereafter, the

---

[3] The defense maintained that "Keith" was the actual perpetrator of the robbery.

[4] In its brief, the State concedes that the discrepancies between the two phone records were "somewhat strange."

7

trial court sentenced Defendant to twelve years' imprisonment on each offense, the sentences to run concurrently. This appeal follows. Additional facts will be discussed in the context of our analysis of the claims on appeal.

## Standard of Review

"Issues that were not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error." State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009). Plain error review is a two-step process. Baumruk, 280 S.W.3d at 607. First, we must determine whether the claim of error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.'" Id. (quoting State v. Brown, 902 S.W.2d 278, 284 (Mo. banc 1995); Rule 30.20. Not every prejudicial error, however, constitutes plain error, as plain errors are "evident, obvious, and clear." Id. If the claim of plain error facially establishes grounds for believing that manifest injustice or a miscarriage of justice resulted, we may elect to exercise our discretion and proceed to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. Id.

## Discussion

Defendant has raised two interrelated points on appeal. Defendant concedes that his claims of error are not preserved for review because he did not file a motion for new trial. He asks that we review for plain error, which we may do at our discretion. Rule 30.20. For ease of discussion, we take Defendant's points out of order.

In his second point, Defendant argues the trial court plainly erred in sustaining the State's objection to the admission of Sprint call records for Victim's phone that documented the date, time, and phone numbers of incoming and outgoing calls because expert testimony is not required

8

to admit historical information contained in cell phone call records and the exclusion of the evidence severely prejudiced Defendant's defense and resulted in manifest injustice. We agree.

The determination of whether to admit evidence is within the sound discretion of the trial court. State v. Johns, 34 S.W.3d 93, 111 (Mo. banc 2000). Our review is for prejudice, not mere error, and the trial court's decision will be reversed only if the error was so prejudicial that it deprived the defendant of a fair trial. State v. Strong, 142 S.W.3d 702, 710 (Mo. banc 2004). Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial. State v. Zink, 181 S.W.3d 66, 73 (Mo. banc 2005).

At trial, Defendant sought to introduce certified records of Victim's cell phone account to show that 30 minutes after the robbery at 9:10 p.m. on August 10, 2012, the phone was used to call Perry. The records, which were provided by Sprint pursuant to Section 490.692, list the date, time, and numbers of incoming and outgoing calls. The defense sought to use these records to support its alternative perpetrator defense and to impeach Victim's self-prepared call logs.

The State objected to the Sprint records but not on the basis of their authenticity. Instead, the State argued that the records were confusing and expert testimony was necessary to explain the records so the jury would be capable of understanding them:

> Judge, we did receive a copy of those certified records. I believe we subpoenaed them as well. There's numerous columns on the sheet, including calling number, called number, dialed digits, MR number, start date, end date, duration, repoll number, first cell, last cell.
>
> In addition to that, sometimes the calling number is a ten digit number like a normal telephone number, sometimes it's a four digit number, sometimes it says routed call under the MR number, sometimes it says inbound, sometimes it says outbound.
>
> We think that these records are confusing to not only us but a lay person who would be on the jury, and without someone here to explain what these numbers mean and these columns mean to the jury, we think that the jury may be misled by some of the information on these records. Although they have been self-authenticated, that doesn't mean they should be admitted or used in a trial. They still need to lay a foundation for what these numbers and words mean for a

9

jury.

The State also argued that the proffered records were misleading in that, according to the State, it had obtained records for Perry's cell phone that did not show a corresponding incoming call from Victim's phone on August 10, 2012. The State contended it was Defendant's responsibility to retain an expert to explain the alleged inconsistency between the records Defendant obtained from Sprint and the records the prosecutor alluded to:

> [T]hat 373-0135 number that according to these records was called, the state's also obtained some cell phone records from the same company, Sprint Nextel for that number, that 373-0135, and the number that allegedly is called from the first set of records does not appear on the second set of numbers.
> So again, we would ask that, you know, someone from Sprint needs to be called I guess by the defense to explain what the discrepancy may be. So again, that just shows that may be misleading depending on what these numbers and words mean.

Although the State offered no proof regarding Perry's cell phone records, the trial court sustained the objection and ruled the Sprint records inadmissible unless Defendant produced an expert witness capable of explaining the meaning of the records.

> The court, after hearing argument for counsel, believes that the records are records in which the jurors cannot discern without some type of expert assistance as to, one, the true meaning of all of the columns on the Sprint records, but also between the two sets of Sprint records, the one purported to be used by defense and the one that's been mentioned by the state for number 373-0135, how the jurors are to make a determination that in one set of Sprint records the phone call appears and the number that was supposedly called in those records, the number— the call doesn't appear.
> The Court does not believe that that is an issue of weight and the court will not allow, without some expert testimony as to how those records are prepared and what those separate columns mean and how one number can show up on a call and one won't, the court is not going to allow the usage of the Sprint phone records over objection.

Here, the trial court's refusal to admit the Sprint records without expert testimony was an abuse of discretion as expert testimony is not a precondition for the admission of historical information contained in phone records. State v. Patton, 419 S.W.3d 125, 129-30 (Mo. App. E.D.

2013) (reading coordinates of cell phone sites from defendant's phone records and plotting them on map in order to place defendant near crime scene at time of shootings for which he was on trial was not scientific procedure or technique). The purpose of expert testimony is to assist the jury in areas which are outside of everyday experience or lay experience. State v. Harris, 305 S.W.3d 482, 490 (Mo. App. E.D. 2010). Expert testimony is admissible on subjects about which the jurors lack experience or knowledge. Id. In the instant case, expert testimony was not a prerequisite for using cell phone records to establish historical facts such as the time and duration of calls which can be ascertained simply by reading the records. No scientific procedure or technique was necessary for jurors to understand that a call was placed at 9:10 p.m. on August 10, 2012, to the telephone number 314-373-0135, which was identified as Perry's phone number. Patton, 419 S.W.3d at130. Moreover, the alleged inconsistency between Victim's phone record and the call placed to Perry 30 minutes after the robbery did not compel the exclusion of the records offered by Defendant as the State did not offer authenticated records for Victim's phone or any other evidence in support of this claim but rather relied on Victim's self-reported call logs. In this instance, where the State did not question the authenticity of the Sprint cell phone records, we find that the exclusion of these records resulted in prejudice to Defendant by inhibiting his ability to put forth a defense thereby possibly affecting the outcome of the trial. Point granted.

In his first point, Defendant contends the trial court plainly erred in sustaining the State's objections and excluding certain evidence offered by Defendant to support his alternative perpetrator theory because this evidence established a direct connection between the alleged alternative perpetrator and the robbery. Defendant contends that the exclusion of this evidence resulted in manifest injustice by depriving Defendant of his right to present a complete defense. We agree.

11

The essence of the defense's theory was that someone other than Defendant robbed Victim for her cell phone and money. The defense offered evidence in support of this theory that tended to show that Esters was the person who actually carried out the robbery. The State objected to the admission of all such evidence as prejudicial and irrelevant. The trial court generally accepted the prosecution's arguments for excluding Defendant's alternative perpetrator evidence and barred the defense from presenting most of its alternative perpetrator evidence at trial thereby severely inhibiting Defendant's defense.

Missouri follows the "direct connection rule" to determine the admissibility of evidence that another person is guilty of the crime charged. According to the direct connection rule, "evidence that another had opportunity or motive is admissible if there is also proof that the other person committed some act directly connecting him with the crime." State v. Speaks, 298 S.W.3d 70, 86 (Mo. App. E.D. 2009) (quoting State v. Woodworth, 941 S.W.2d 679, 690 (Mo. App. W.D. 1997)). "The evidence must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person." Speaks, 298 S.W.3d at 86 (quoting Woodworth, 941 S.W.2d at 690).

If the defendant satisfies the direct connection rule's threshold showing by establishing a clear link between the alleged alternative perpetrator and the corpus delicti of the crime, then all evidence tending to show that the alleged alternative perpetrator had a motive and opportunity to commit the crime is admissible even if that evidence would not independently establish a direct connection to the crime. State ex rel. Koster v. McElwain, 340 S.W.3d 221, 249-250 (Mo. App. W.D. 2011) (holding that when the alleged alternative perpetrator is connected to a key piece of evidence in the crime it "opens the door to the admissibility of all evidence suggesting that [the

12

alternative perpetrator] had the motive and opportunity" to commit the crime).[5]

Here, the prosecution's case relied entirely on eyewitness identification and testimony; there was no physical evidence linking Defendant to the crime. Victim was the sole eye witness to the crime and as the only eyewitness to the robbery, the State's case depended entirely on the jury finding her credible. As such, the exclusion of the alternative perpetrator evidence denied Defendant the ability to present evidence he could have used to undermine Victim's credibility. Specifically, the exclusion of the Sprint records prevented the defense from effectively cross-examining Victim to expose the inaccuracies in the information she gave to the police. See State v. Thompson, 68 S.W.3d 393, 394 (Mo. banc 2002) (stating that "through cross-examination alone, the defense can establish facts, a defense, or theory of the case"). In cases where a witness's credibility is pivotal to securing a conviction, courts have found that the improper denial of impeachment evidence is incompatible with the accused's right to a fair trial. See Merriweather v. State, 294 S.W.3d 52, 57 (Mo. banc 2009) (concluding that where the victim was the sole eyewitness and there was no circumstantial evidence implicating the defendant, "[i]f the jury disbelieved [the victim's] version of the evidence, an acquittal was more likely to occur"). The trial court's exclusion of evidence Defendant could have used to impeach Victim also could have affected the trial's outcome.

Defendant also argues the court excluded other alternative perpetrator evidence which linked Esters to the crime and showed that he had a motive and opportunity to commit the robbery. "Although there is 'broad latitude under the Constitution to establish rules excluding evidence from criminal trials[,]' that latitude is limited by the defendant's constitutional rights to

---

[5] The State also conceded during oral argument that there was enough evidence to establish a direct connection between Esters and the robbery in the instant case mentioning specifically that Perry was in possession of the stolen phone and Esters's admission to Perry that he had stolen the phone from a white person.

'a meaningful opportunity to present a complete defense,' which are rights rooted in the 14th Amendment due process clause and the 6th Amendment compulsory process and confrontation provisions." State v. Nash, 339 S.W.3d 500, 513 (Mo. banc 2011) (quoting Holmes v. South Carolina, 547 U.S. 319, 324 (2006). Moreover, courts have found outcome-determinative prejudice when a defendant is prevented from fully establishing an alternative perpetrator defense. Woodworth, 941 S.W.2d at 692 (finding that exclusion of alternative perpetrator evidence "could well have affected the outcome of the trial" where evidence against defendant was "tenuous"); McElwain, 340 S.W.3d at 252 (finding that habeas petitioner established Brady[6] prejudice "because *all* evidence suggesting that [the alleged alternative perpetrator] had a motive and an opportunity to murder [the victim] became admissible" once the alleged alternative perpetrator had been directly connected to the murder).

Based on our review of the record, and mindful of the trial court's discretion in evidentiary matters, the exclusion of Defendant's alternative perpetrator evidence could have been likewise outcome-determinative. The Defendant's proposed evidence included: proof that Esters owned a handgun like the one brandished by the robber; that clothes matching the description of those worn by the perpetrator were concealed under Esters's sofa; that Victim's phone was used to call Esters's girlfriend 30 minutes after the robbery; that the BP employees positively identified Esters as the individual who sold Victim's phone in the presence of Perry; that Victim recognized Esters as someone who resembled the man who robbed her, and that Esters attempted to steal a cell phone from a woman in the immediate vicinity eight days later. This evidence could show that Esters may have had the motive and opportunity to commit the offense Defendant was charged with. The exclusion of this alternative perpetrator evidence was

---

[6] Brady v. Maryland, 373 U.S. 83 (1963).

prejudicial and there is a reasonable probability that the trial court's error affected the outcome of the trial. As such, the erroneous exclusion of the Sprint records and additional probative evidence prejudiced the defense's theory that Defendant did not commit the robbery, resulting in manifest injustice. Points granted.

## Conclusion

We reverse and remand for a new trial.

_____
Mary K. Hoff, Presiding Judge

Glenn A. Norton, Judge, and Philip M. Hess, Judge, concur.