

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI, )
)
    Respondent, )
) **WD85439**
    v. ) **OPINION FILED:**
) **JUNE 18, 2024**
JAHUAN D. WHIRLEY, )
)
    Appellant. )

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Jon E. Beetem, Judge**

**Before Division One: Lisa White Hardwick, Presiding Judge, Alok Ahuja, Judge, and
Anthony Rex Gabbert, Judge**

JaHuan Whirley appeals the judgment of the Cole County Circuit Court convicting

him of murder in the second degree, assault in the first degree, two counts of armed

criminal action, two counts of attempted robbery in the first degree, and two counts of

unlawful use of a weapon. Whirley was sentenced to life in prison for murder and assault

and was sentenced to serve fifteen years in prison for the remaining counts, with all

sentences to be served concurrently. He argues in five points on appeal that the trial court

erred in excluding evidence that another person committed the crime, in refusing

proposed jury instructions, in denying a motion to dismiss based on ineffective assistance

of counsel at an adult certification hearing, in overruling a motion to suppress physical

evidence, and in overruling a motion to suppress statements given to law enforcement

officers. The judgment is reversed and remanded for further proceedings consistent with this opinion.

## Facts

This case was initiated under the juvenile code. The Juvenile Officer moved to certify Whirley as an adult, and he was so certified. In April 2019, Whirley was indicted on one count of murder in the second degree, section 565.021,[1] one count of assault in the first degree, section 565.050, two counts of armed criminal action, section 571.015, two counts of attempted robbery in the first degree, section 570.023, and unlawful use of a weapon, section 571.030. The State of Missouri ("the State") alleged that Whirley attempted to rob A.M. ("Victim 1") and J.R.K. ("Victim 2") and in the process murdered Victim 2 and caused serious physical injury to Victim 1 by shooting him.[2]

In May 2019, Whirley filed a motion to dismiss arguing in part that his certification counsel was ineffective. The trial court held a hearing on the motion. It denied the motion in October 2019.

In April 2020, Whirley moved to suppress evidence seized from his home, arguing his mother's consent to search was not voluntary. He also moved to suppress statements he made to police just before his arrest. At the suppression hearing, law enforcement officers testified that Whirley was not in custody when he was questioned and that his

[1] All statutory citations are to RSMo 2016 as updated through the date of the crimes unless otherwise indicated.

[2] Whirley was sixteen and a half years old at the time of the shooting.

2

mother consented orally and in writing to a search of the house. In July 2020, the trial court overruled both motions to suppress.

Jury selection began in September 2020. The next business day, the State moved for a continuance, alleging there was DNA evidence that had not been tested. Whirley objected to the continuance, arguing he had been in custody for nearly two years. The trial court continued the case.

In November 2020, the State filed a supersedeas indictment alleging a count of murder in the first degree, section 565.020, instead of murder in the second degree, and adding a count of unlawful use of a weapon, section 571.030. The State also filed notice it intended to seek a sentence of life without parole.

The case proceeded to jury trial in March 2022. In the light most favorable to the verdict,[3] the following evidence was presented at trial. In December 2018, Whirley approached Victim 1 and Victim 2 who were smoking outside their apartments in Jefferson City, Missouri. Whirley pulled out a black Glock 9-mm semiautomatic handgun with an extended magazine and said, "Give me your shit." Whirley wore a gray or silver hooded sweatshirt and a black ski mask. Victim 1 pulled out his cigarettes and lighter and set them on a brick pillar. Victim 2 and Whirley exchanged words, and Whirley again stated, "give me your shit." Victim 1 tossed Lexus car keys to Whirley,

---

[3] "We state the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences." *State v. Foster*, 591 S.W.3d 518, 520 n.1 (Mo. App. W.D. 2019) (internal quotation marks omitted).

who caught them. Victim 2 and Whirley again exchanged words. Victim 1 did not recall the words, but they were not fighting words.

Whirley shot Victim 1 three times and Victim 2 four times. Whirley ran off toward an alley. He fired a total of 13 shots from a 9-mm semiautomatic handgun. Some of the bullets penetrated into the interior residential units, including one occupied by Victim 1's fiancée and infant son.

Victim 2 died from his injuries. Victim 1 was shot in the shoulder, in the left arm, and in the back. Victim 1's bone in his left arm shattered, and he still had the bullet in him that entered his back. Victim 1 was in the hospital for several weeks, had two surgeries, and required months of physical therapy. At the time of trial, he still had PTSD and anxiety from the shooting.

The day after the shooting, Whirley repeatedly pounded on the door of an apartment in the same neighborhood as the shooting. Police were called to the scene. Whirley told the responding officers that he was looking for his cell phone which he said he lost while walking around the area after the shooting the day before. Whirley told officers he had been wearing a gray hooded sweatshirt and black pants on the previous night. This was similar to the description Victim 1 gave to officers of the clothing worn by the assailant. Whirley denied involvement in the shooting, but stated he and his twin brother ("Brother") had come out to see what was going on once police arrived. When asked, Whirley stated he would not have gunshot residue on him but then stated he might because he had shot Brother's AR gun before. He was arrested for disturbing the peace.

4

Whirley's mother consented to a search of her home, where Whirley lived, both orally and in writing. Officers found a bag Whirley testified was his. Inside that bag, officers found the murder weapon, 9-mm ammunition matching that found at the crime scene, a debit card in Whirley's name, and Whirley's driver's license. Thirteen shell casings of AUSA Luger 9-mm ammunition were recovered at the scene, and there were 13 empty spaces of the 31 available spaces in the gun's extended magazine found in Whirley's bag which was found at his house. AUSA Luger 9-mm ammunition was loaded into the remaining spaces of the extended magazine on the 9-mm semiautomatic Glock handgun in Whirley's bag. The shell casings recovered at the scene were fired by the gun found in Whirley's bag at his house. Whirley's DNA was found on the extended magazine associated with the murder weapon.

A gray hooded sweatshirt and black ski mask with Whirley's DNA on it were found near the bag. Gunshot residue was located on the ski mask and/or gloves and on the gray hooded sweatshirt. Whirley testified in his own defense and denied shooting the victims. He admitted the black bag, ski mask, and hooded sweatshirt were his.

The jury found Whirley guilty of the lesser included charge of murder in the second degree. It found Whirley guilty of all the other counts. The jury recommended sentences of life in prison for murder in the second degree and assault in the first degree. It recommended sentences of fifteen years for the remaining counts. In June 2022, the court sentenced Whirley accordingly, all sentences to run concurrently.

This appeal follows.

**Point I**

In his first point on appeal, Whirley claims the trial court abused its discretion in excluding evidence that a person other than Whirley committed the offenses. The trial court found that there was not a direct connection between the alternative perpetrator and the offense. Whirley states he showed that that alternative perpetrator possessed a murder weapon close in time to the offenses, the alternative perpetrator was convicted for committing offenses with the murder weapon and the same ammunition used in the instant offenses within days of the instant offenses, the alternative perpetrator had possessed the bag in which the murder weapon was found, and the alternative perpetrator wore clothing matching the description of the murderer the day prior to the instant offenses.

"The trial court is vested with broad discretion to exclude or admit evidence at trial." *State v. Whittier*, 591 S.W.3d 19, 23 (Mo. App. E.D. 2019) (internal quotation marks omitted). "We review the trial court's evidentiary rulings for an abuse of that broad discretion." *Id*. (internal quotation marks omitted). "An abuse of discretion occurs when the trial court's decision is so against the logic of the circumstances then before it, or so unreasonable and arbitrary, that it shocks one's sense of justice and indicates a lack of careful consideration." *Id*. "We reverse on such a basis only when an appellant establishes both error and resulting prejudice." *Id*.

"Generally a defendant may introduce evidence tending to show that another person committed the offense, if a proper foundation is laid, unless the probative value of

the evidence is substantially outweighed by its costs (such as undue delay, prejudice or confusion)." *Id*. (internal quotation marks omitted). "Missouri courts have been consistent in holding evidence showing another person had a motive or an opportunity to commit the crime is not admissible to cast a bare suspicion on another person." *Id*. "Such evidence may be admissible, provided the defendant can satisfy the so-called 'direct connection rule.'" *Id*. "In order to satisfy this rule, [t]he evidence must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides [the defendant] as the guilty person." *Id*. (internal quotation marks omitted).

> If the defendant satisfies the direct connection rule's threshold showing by establishing a clear link between the alleged alternative perpetrator and the corpus delicti of the crime, then all evidence tending to show that the alleged alternative perpetrator had a motive and opportunity to commit the crime is admissible even if that evidence would not independently establish a direct connection to the crime.

*State v. McKay*, 459 S.W.3d 450, 458 (Mo. App. E.D. 2014).

On appeal, Whirley states he was precluded from presenting the following evidence that Brother was the shooter: Detective Ambler went inside Whirley's home where significant evidence of the offenses was obtained. Brother was in the house at the time. Brother lived at a different house; both houses were within a block and a half of the shooting scene.

Officer Finke spoke with Brother at Whirley's home. Officer Finke extracted data from Brother's cell phone. That extraction revealed photographs from around 25 days

before the shooting showing Brother and another person holding a gun. The partial serial number visible on the gun in the photograph matched the gun the State identified as the gun used in the shooting. Other photographs showed Brother with the bag which contained the gun used in the shooting. Photographs taken the day before the shooting show Brother wearing clothing consistent with descriptions of the clothing worn by the shooter. Photographs taken on different dates showed Brother outside and inside Whirley's home, showing he had access. The phone had a note dated five days before the shooting which stated, "Glock Gotta Tail It Look Like Ah bever If u Try To Run It Get Hot Like Fever…." Brother's phone had a sent text message stating, "Damn I can't find my gun." Brother's phone showed a text message sent in November 2018 about "my gun." It showed text messages from September 2018 indicating Brother had a gun. The phone contained notes created in August 2017 and modified in February 2018 indicating Brother had a gun, talking about shooting, and stating in part, "I got me clip it's long like a belt." Whirley notes that the gun in the shooting was described as having an extended magazine.

The police evidence technician and custodian collected eighteen shell casings from the scene of a shooting that took place about a week before the shooting at issue in this current case. Some of those casings were of different calibers and from different manufacturers. Nine of those shell casings were 9-mm shells stamped with "AUSA Lugar." Brother was charged and convicted for his involvement in the shooting that took place about a week before the shooting at issue in this case.

Whirley's counsel made the following argument to the trial court:

We now know from Brother's cell phone extraction -- First, we now know from law enforcement that this is [Brother's] cell phone, right? We know that [Brother] literally did a shooting, which he is currently in the Department of Corrections for, that was a case in this county. … We know that on that case the same shell casings were present at that scene as were present at the scene of the crime of which [Whirley] is alleged to have committed, a Luger AUSA 9-millimeter.

We have photographs of [Brother] in multiple gray hoodies and that is one of the descriptions that [Victim 1] gave. We have a gun that we can quibble about whether we think that the serial number appears to be a match. Obviously it is the defense's position that it does. But it is unequivocal from the photos in this offer of proof that it is the same make and model. We can see that it is … a Glock, Model 26, it has got the word Austria on it, and it says a 9 x 19 on the side, all of which is consistent with the weapon in this case, whether or not, whether or not we can definitively say the serial number matches. We have a long clip; photos of that gun and [Brother] holding that gun with an extended -- what I'm going to call an extended magazine, a long clip, as well as a standard sized clip which matches the evidence in this case, multiple clips, multiple magazines, found with the murder weapon that we have photos now showing were in [Brother's] possession.

And not only that, we have … photos of [Brother] wearing the bag in which the gun was found and texting … that the police almost searched his bag and found his gun and these photos are from October and November … and December of 2018, so we now have three months of continuing possession of this gun tied to [Brother]. And he acknowledges in the text messages, my gun.

And then he made himself a one minute murder put in an -- spelled more in a way he might pronounce -- album cover and he searches Jeff City murder rate and Jefferson City crime rate hours before this shooting happened.

And not to mention the fact, Your Honor, that this ties into evidence that was introduced through the State's witness today. There are at least two people's DNA on the handgun itself. There are at least two people's DNA on the extended magazine, Your Honor. … And I think that it is undisputable that all of this taken together makes it less likely that Jahuan Whirley is the person who committed this crime and it is, therefore, admissible. …

We have evidence in this trial that [Brother] was in the neighborhood at the time -- around the time of the search of the house. We have evidence from the offer of proof that [Brother] went back to his house … which is very close. I mean, one block up from [the scene of the current shooting].
…

To what extent the State can argue that there is no corpus, no connection to the corpus of this crime, I think that we can argue there is no corpus connecting [Whirley] to this crime, independent of [Whirley] telling police that he went out to see what was going on the night before. [Whirley] had always denied it, but he did acknowledge that he had been out the night before. But the fact that we've got a gun that looks very much like the murder weapon in [Brother's] possession, with the fact that we've got photos of [Brother] wearing a gray hoodie, so obviously possessing a gray hoodie that matches at least a description of the hoodie that [Victim 1] gave, that he went to the Department of Corrections on a case in which the same shell casings were used, and that he was wearing the bag in which the murder weapon in this case was found do tie him to the corpus of this case I would respectfully assert.

Whirley makes essentially the same arguments now on appeal.

Whirley argues that his case is analogous to *State v. McKay*. In that case, a victim was robbed of her cellphone at gunpoint. 459 S.W.3d at 452. The prosecution's robbery and armed criminal action case relied entirely on eyewitness identification and testimony. *Id*. at 458. The victim was the sole eyewitness, and, the prosecution's case "depended entirely on the jury finding her credible." *Id*. at 459. "As such, the exclusion of the alternative perpetrator evidence denied Defendant the ability to present evidence he could have used to undermine Victim's credibility." *Id*. "In cases where a witness's credibility is pivotal to securing a conviction, courts have found that the improper denial of impeachment evidence is incompatible with the accused's right to a fair trial." *Id*. The defendant's proposed evidence included proof that the alternative perpetrator owned a

handgun like the one brandished by the robber; that clothes matching the description of those worn by the perpetrator were concealed under the alternative perpetrator's sofa; that the victim's phone was used to call the alternative perpetrator's girlfriend 30 minutes after the robbery; that store employees positively identified the alternative perpetrator as the individual who sold the victim's phone; that the victim recognized the alternative perpetrator as someone who resembled the man who robbed her, and that the alternative perpetrator attempted to steal a cell phone from a woman in the immediate vicinity eight days later. *Id*. The State of Missouri conceded at oral argument that this was sufficient evidence to establish a direct connection between the alternative perpetrator and the robbery. *Id*. at 458 n.5. The court found that the defendant should have been permitted to present this evidence. *Id*. at 460.

In *State v. Barriner*, 111 S.W.3d 396, 397 (Mo. banc 2003), two women were murdered. A hair was found on one victim's thigh and another hair was found in one of the knots that bound the second victim. *Id*. at 399. The hair did not match the defendant or either of the victims. *Id*. at 399-400. Defense counsel was not permitted to offer evidence that hair samples were retrieved that did not belong to the defendant or victims. *Id*. at 400. The Missouri Supreme Court found that this was error, because the evidence of the hairs represented "more than the mere motive or opportunity of another person." *Id*. "It was not disconnected or remote. The hairs are physical evidence that could indicate another person's interaction with the victims at the crime scene." *Id*. The court

11

held that the defendant was "entitled to present to the jury this evidence of another person's direct connection to the murders." *Id*.

In *State ex rel. Koster v. McElwain*, 340 S.W.3d 221 (Mo. App. W.D. 2011) ("the *Helmig* case"), this Court held that a defendant would have been entitled to present alternate perpetrator evidence, if the defendant had been aware that the alternate perpetrator was associated with a cancelled check which was found with a murder victim's discarded purse. In the *Helmig* case, Dale Helmig was convicted of the murder of his mother Norma Helmig. *Id*. at 227. Part of the State's theory of the case was that Dale Helmig had discarded his mother purse on a riverbank shortly after killing her. *Id.* at 249. Evidence of which the defense later became aware revealed, however, that the cancelled checks found with Norma Helmig's purse had cleared the bank *after* Norma Helmig's murder, had been mailed to her, and had been retrieved by her husband, Ted Helmig. *Id.*

This Court concluded that, given the timing of the processing and mailing of Norma Helmig's cancelled checks, "Ted Helmig became connected to a key piece of evidence in the crime—the purse where the cancelled checks were found." *Id*. (emphasis omitted). Although we recognized that there might be other explanations for the presence of the cancelled checks with Norma Helmig's discarded purse, we held that the inference that Ted Helmig was the one who had murdered her and discarded her purse supported the admission of all evidence suggesting Ted Helmig as an alternate perpetrator:

12

the fact that there may be other explanations for the discovery of the cancelled checks with the purse besides an inference that Ted Helmig threw the purse and the cancelled checks in the river sometime following his murder of Norma Helmig does not relieve us of the obligation to acknowledge that Ted Helmig has now been connected to the purse—material evidence in Norma Helmig's murder case.

The connection of the purse to Ted Helmig opens the door to the admissibility of all evidence suggesting that Ted Helmig had the motive and opportunity to kill Norma Helmig.

*Id.* at 250.

"The *corpus delicti* in a homicide case consists of two elements: (1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death." *State v. Edwards*, 116 S.W.3d 511, 544 (Mo. banc 2003). "[E]vidence of an alternative perpetrator is admissible only if there is also proof that the other person committed *some act* directly connecting him with the crime." *State v. Benedict*, 495 S.W.3d 185, 191 (Mo. App. E.D. 2016) (emphasis in original). "The defendant must establish 'a clear link' between the alleged alternative perpetrator and a 'key piece of evidence' in the crime." *Id.*; *see also State v. Harding*, 528 S.W.3d 362, 378 (Mo. App. E.D. 2017).

In *McKay*, the victim's cell phone that was stolen was used to call the alternative perpetrator's girlfriend after the theft and the alternative perpetrator was identified as the person who later sold the victim's cell phone. 459 S.W.3d 459. In *Barriner*, the hairs were found on the victims at the crime scene. 111 S.W.3d 399. Both of those cases involved evidence that directly tied a third party to the crime scene. *Whittier*, 591 S.W.3d

13

at 23-24 (evidence the alternative perpetrator was violent toward the victim in the past, possessed a gun, and stalked the victim after they broke up was properly excluded); *State v. Wright*, 551 S.W.3d 608, 615–16 (Mo. App. E.D. 2018) (evidence that a witness saw a man who was not the defendant flee the area of a shooting did not meet the direct connection requirement because the witness did not see the man carry a firearm or running directly from the site of the shooting and the timing of the shooting and the man fleeing was not certain); *State v. Bowens*, 550 S.W.3d 84, 100 (Mo. App. E.D. 2018) (evidence the alternative perpetrator wore a Bulls hat like the suspect in the case before the court and used a gun in other robberies in the same city was properly excluded); *State v. Nash*, 339 S.W.3d 500, 515 (Mo. banc 2011) (evidence the alternative perpetrator's fingerprints were on the victim's car and that the alternative perpetrator falsely denied to police that he had met the victim or been to the town where she lived, was previously arrested for stalking a woman with the intent to assault her sexually, and was known to carry a shotgun in his vehicle was properly excluded).

In the current case, Whirley presented evidence that Brother had possession of a gun that was arguably the same gun used in the shooting at issue in the current case, that Brother possessed a bag that was arguably the same bag that the murder weapon in the current case was found in, that Brother had clothes consistent with the clothes the shooter in the current case wore, that the same type of ammunition used in the current shooting was used in an unrelated shooting Brother pleaded guilty to; that Brother was in the area when and where the current shooting occurred, and that Brother was in Whirley's house

14

when police found the murder weapon there. These things all occurred close in time to the shooting at issue in the current case. This evidence establishes a clear link between Brother and key evidence from the shooting in the current case. The trial court abused its discretion in excluding evidence that Brother was an alternative perpetrator. The exclusion of this evidence was prejudicial. *McKay*, 459 S.W.3d at 459 ("Moreover, courts have found outcome-determinative prejudice when a defendant is prevented from fully establishing an alternative perpetrator defense.").

The point is granted.

## Point III

In his third point on appeal, Whirley claims the trial court abused its discretion in denying his motion to dismiss the criminal cause of action and remand the cause for a new certification hearing in juvenile court.[4] He argues he established that he received ineffective assistance of counsel at his certification hearing. Whirley states the standard for determining whether counsel is ineffective in a certification hearing should be the same standard applied in criminal cases and, under that standard, it is clear from the

---

[4] In *In re T.J.H.*, 479 S.W.2d 433 (Mo. banc 1972), the Missouri Supreme Court held that an order dismissing a petition and relinquishing juvenile division jurisdiction was not a final, appealable order. The court stated the waiver of juvenile jurisdiction could be challenged by filing a motion to dismiss in the court of general jurisdiction. *Id*. at 435. In 2020, the Missouri Supreme Court held that the 1994 amendments to section 211.261.1 provided a statutory right to appeal from the dismissal of a juvenile case and transfer of the case to a court of general jurisdiction. *D.E.G. v. Juv. Officer of Jackson Cnty.*, 601 S.W.3d 212, 217 (Mo. banc 2020). The State agrees that, because Whirley's certification occurred prior to *D.E.G.*, his motion to dismiss was the appropriate way to challenge his certification as an adult.

15

record that Whirley's counsel was ineffective in failing to conduct any investigation. Whirley claims that there is at least a reasonable probability that he would not have been certified had certification counsel conducted an investigation. Though we find Point I to be dispositive, we address this point also. Whirley's claim of ineffective assistance by his juvenile certification counsel would arguably entitle him to a new juvenile certification hearing, which is broader relief than being granted a new trial in the circuit court.

"Certification hearings occur in what we refer to as the 'Juvenile Court,' even though it is actually a division of the Circuit Court." *C.R.B. v. Juv. Officer*, 673 S.W.3d 135, 139 (Mo. App. W.D. 2023). "As such, they do not have to conform with all of the requirements of a criminal trial or even of the usual administrative hearing as long as they measure up to the essentials of due process and fair treatment." *Id*. (internal quotation marks omitted). "So long as the juvenile receives a hearing, access to counsel, and access to his or her records, and so long as the juvenile court's decision adequately sets forth the grounds for its decision to certify such that we can review it adequately, the process is sufficient constitutionally." *Id*.

"Th[e] right to counsel implies that counsel must be effective." *Id*. (internal quotation marks omitted). "Missouri courts have not yet decided whether claims of ineffective assistance of counsel at certification hearings are determined by applying the 'meaningful hearing' standard or the *Strickland* standard." *Id*. Whirley argues the *Strickland* standard applies.

16

"The 'meaningful hearing' standard, used in other civil matters such as termination of parental rights cases, examines whether the attorney was effective in providing his client with a meaningful hearing based on the record." *Id*. (internal quotation marks omitted). The *Strickland* standard is more stringent. *Id*.

> The *Strickland* standard, used to determine whether Counsel was ineffective in criminal cases, requires a demonstration, by a preponderance of the evidence that: (1) counsel failed to exercise the level of skill and diligence that a reasonably competent attorney would have under similar circumstances, and (2) the client suffered prejudice as a result.

*Id*. If the appellant fails to show prejudice, this court need not address counsel's performance. *Id*. at 140. "In certification cases, prejudice amounts to a reasonable probability that he would not have been certified to be prosecuted as an adult but for counsel's ineffectiveness." *Id*. (internal quotation marks omitted).

> Section 211.071.1 states in relevant part:

> [I]f a petition alleges that any child has committed an offense which would be considered first degree murder under section 565.020, second degree murder under section 565.021, first degree assault under section 565.050, … first degree robbery under section 569.020, … or has committed two or more prior unrelated offenses which would be felonies if committed by an adult, the court shall order a hearing, and may in its discretion, dismiss the petition and transfer the child to a court of general jurisdiction for prosecution under the general law.

Section 211.071.6 states that a written report shall be prepared which includes consideration of the following criteria:

> (1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;
> (2) Whether the offense alleged involved viciousness, force and violence;

(3) Whether the offense alleged was against persons or property with greater weight being given to the offense against persons, especially if personal injury resulted;

(4) Whether the offense alleged is a part of a repetitive pattern of offenses which indicates that the child may be beyond rehabilitation under the juvenile code;

(5) The record and history of the child, including experience with the juvenile justice system, other courts, supervision, commitments to juvenile institutions and other placements;

(6) The sophistication and maturity of the child as determined by consideration of his home and environmental situation, emotional condition and pattern of living;

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile court; and

(10) Racial disparity in certification.

"The juvenile court is not required to give equal weight to, nor to make express findings on, each one of these non-exclusive factors." *J.N.W. v. Juv. Officer*, 643 S.W.3d 618, 632 (Mo. App. W.D. 2022). "[T]he court is only required … to make [f]indings showing the reasons underlying the court's decision to transfer jurisdiction in a manner that is sufficient to permit meaningful appellate review." *Id*. (quoting in part §211.071.7(4)) (internal quotation marks omitted). "Although the criteria listed in section 211.071.6 are not exclusive and the juvenile court need not give equal weight to each one, the first three factors contain some of the most critical considerations in certification and the seriousness of the offense dominates our inquiry." *Interest of K.M.F.*, 668 S.W.3d 302, 310 (Mo. App. E.D. 2023) (internal quotation marks omitted).

"Despite the right to effective assistance of counsel, no statute or case from this Court provides a mechanism for a committed juvenile to raise an ineffective assistance of counsel claim." *D.C.M. v. Pemiscot Cnty. Juv. Off.*, 578 S.W.3d 776, 782 (Mo. banc 2019). "When deciding whether claims for ineffective assistance of counsel can be addressed on direct appeal, the pertinent question is whether the record is sufficient to address the claim." *Id.* "A claim of ineffective assistance of counsel typically cannot be addressed on direct appeal, however, when issues are likely to arise regarding ... counsel's failure to adequately investigate or prepare for trial, or counsel's failure to pursue defenses or witnesses." *Id.* at 783 (internal quotation marks omitted). "In each of these scenarios, the record is likely to be incomplete with respect to the claim of ineffective assistance." *Id.* If the record is insufficient, this court can remand the case to the circuit court for an evidentiary hearing to determine whether counsel was ineffective. *Id.* at 785.

In the current appeal, Whirley argues that his counsel was ineffective for failing to meet with him and investigate or prepare for the certification hearing. However, the trial court held a hearing on his motion to dismiss and remand for juvenile proceedings. Multiple witnesses testified at this hearing. One of those witnesses was Whirley's counsel who represented him at his certification hearing ("Certification Counsel"). A family friend of Whirley testified. The Juvenile Officer who represented the State against Whirley testified. A Deputy Juvenile Officer who had prior interactions with Whirley testified.

Certification Counsel testified that another attorney at the law firm where Certification Counsel worked brought Whirley's case to her attention about two weeks before the certification hearing. The matter was officially assigned to Certification Counsel roughly twelve to eighteen hours prior to the certification hearing. Certification Counsel did not meet with Whirley prior to the certification hearing. She did review Whirley's file. Certification Counsel was unaware if anyone else from her law firm had spoken with Whirley prior to the certification hearing. She did not know if anyone in her office made any kind of investigation with respect to Whirley's case. She did not know if her firm was retained counsel or appointed counsel.

Certification Counsel spoke with the attorney in her firm who assigned her Whirley's case over the course of the two weeks she knew about it and after it was assigned to her. She could not recall how many hours she spent on Whirley's case and indicated she did not remember a lot about representing Whirley. Certification Counsel had received training for juvenile criminal hearings and had stepped in on several different issues for the attorney who assigned Whirley's case to her. She had conducted around 60 trials in her career. Certification Counsel had represented someone in a criminal matter probably somewhere between 300 and 500 times.

Whirley does not argue on appeal that the record is insufficient for this court to determine whether Certification Counsel was ineffective. To the contrary, he cites portions of Certification Counsel's testimony at the motion to dismiss hearing to support his argument. Whirley does not identify additional witnesses he would call or additional

20

evidence he would present in support of his argument. Whirley asks this court to find Certification Counsel ineffective and to remand for a new certification hearing.

This court is faced with an insufficient record in another respect, though. Whirley has not provided this court with the record from the juvenile proceedings. We do not have the order dismissing the juvenile proceedings and certifying Whirley to the court of general jurisdiction. Paragraph 27 of Whirley's motion to dismiss and remand for juvenile proceedings stated:

> The report submitted by the Juvenile Officer in the certification hearing and the final Order certifying Whirley to adult court relied heavily on the first three criteria listed in 211.071, the criteria related to the alleged offense. The seriousness of the allegation, the viciousness, force and violence alleged, and the loss of life were the motivating criteria that resulted in the Court's decision that he was not a proper subject to be dealt with under the juvenile code.

Exhibit A, attached to Whirley's memorandum in support of his motion to dismiss, contained four pages of transcript from the certification hearing. It appears the entire transcript was 63 pages long.

Other than these references, this court has not been provided with a record of what occurred during the certification hearing. This is significant because Whirley has to demonstrate that, had Certification Counsel been effective, Whirley would not have been certified to be prosecuted as an adult. *C.R.B.*, 673 S.W.3d 140. We cannot make this determination without the full record of the certification hearing. As the appellant, it is

21

Whirley's responsibility to prepare a complete record on appeal.[5]  *State v. Thompson*, 147 S.W.3d 150, 161 n.7 (Mo. App. S.D. 2004).  "Failure to supply a sufficient record to permit determination of the issues presented results in the appellate court being unable to determine if the trial court erred and requires that the point be denied."  *Id*. (internal quotation marks omitted).  "Further, when transcripts and exhibits are omitted from the record, this Court can infer that the transcript would not be helpful to Appellant's claim."  *Id*.

The point is denied.

### Points II, IV, and V

In his second point on appeal, Whirley claims the trial court erred in refusing his proposed jury instructions.  In his fourth point on appeal, Whirley claims the trial court erred in overruling his motion to suppress the physical evidence obtained during the warrantless search of his home.  In his fifth point on appeal, Whirley claims the trial court erred in overruling his motion to suppress his statements to law enforcement.  Because we grant the first point and find it dispositive, we decline to address these points on appeal.  They are denied.  *See State v. Edwards*, 60 S.W.3d 602, 616 (Mo. App. W.D. 2001) (declining to address whether a jury instruction should have been given because

---

[5] The State raises the issue of Whirley's failure to provide the record from the certification proceeding in its Respondent's Brief.  Whirley does not respond to this argument in his Reply Brief.

"[w]e cannot predict what evidence might be presented on retrial.  Accordingly, it would serve no worthwhile purpose to adjudicate the point.").

## Conclusion

The judgment is reversed and remanded for further proceedings consistent with this opinion.

_____
Anthony Rex Gabbert, Judge

All concur.